JAMES HUTCHISON, as Trustee, Appellant, Impleaded with Another, *v.* ETHEL A. ROSS et al., Respondents. (Actions Nos. 1 and 2.)

(Argued January 17, 1933; decided July 11, 1933.)

*Nathan L. Miller, H. Bartow Farr* and *Frank B. Ober* for appellant.

*John W. Davis, George W. Martin, Richard S. Emmet,*
*John E. Lockwood, Edwin F. Blair, Harrison Tweed,*

Robert L. Finley, Alanson W. Willcox and Bertram F. Willcox for respondents.

LEHMAN, J.  John Kenneth Ross, a resident of Montreal, married in Toronto in 1902.  In anticipation of their marriage the parties entered into an ante-nuptial agreement to regulate their property rights in accordance with the law of Quebec, where they intended to reside. They still do reside there.  Under the civil law prevailing in that province, there is community of property between spouses, but the parties to a marriage may by ante-nuptial agreement provide that each shall continue to have separate property.  They may also by such ante-nuptial agreement provide for gifts or trusts in favor of one or the other.  After the marriage such provisions in an ante-nuptial agreement may not be abrogated, modified or enlarged.  Neither husband nor wife may transfer to the other, directly or in trust, any substantial part of his or her fortune.

The ante-nuptial agreement made by Ross and his prospective wife provided that the property of each should be separate, and Ross agreed in addition to provide for the support of his wife and to establish either by deed

or will a trust fund of $125,000 for the benefit of his wife and children. Since John Kenneth Ross was at that time a young man without personal fortune, though the only son of a very rich man, his father became a party to the ante-nuptial agreement and guaranteed a " donation " of $125,000 binding upon his estate.

The father of John Kenneth Ross died in 1913, leaving an estate of about $10,000,000 to his son. In 1916, during the World War, John Kenneth Ross, the son, decided that a provision of $125,000 for his family was insufficient, and he told his wife that he desired to provide for her more adequately by creating a trust fund of one million dollars, the income to be paid to his wife for life, and the principal to go to their two children upon her death. One D. M. C. Hogg, a Scotchman learned in the law of Scotland but perhaps not in the law of Quebec, had been the secretary and adviser of Ross' father. Ross, the son, had continued to employ him in the same capacity. Ross directed Hogg to prepare or have prepared appropriate instruments to transfer to the Equitable Trust Company in the city of New York a fund of one million dollars, to be held in trust for his wife. Both father and son had kept bank deposits and had securities valued at more than half a million dollars in New York city, in the New York branch of the Bank of Montreal. Ross desired that such securities, with substitutions and additions sufficient to create a fund of one million dollars, should constitute the corpus of the trust estate.

Hogg, in accordance with what he deemed his instructions, prepared a trust deed or agreement. The trustee was to pay the income to Mrs. Ross during her life and after her death to divide the principal among the children of the marriage her surviving or their issue *per stirpes* or to make other disposition thereof in accordance with the provisions of the instrument. The instrument was submitted to the trust company for approval. After the trust company had agreed to act as trustee, the instrument was

sent to Montreal, where Ross and his wife executed it before the American Consul General. The Equitable Trust Company had not yet signed the indenture, but did so after the indenture was sent to it. Then the Bank of Montreal in New York city, acting as agent for Ross, delivered the securities to the trustee. The trust deed contains a recital that: " Whereas Mr. Ross has become possessed of ample means and is desirous of making suitable provision for Mrs. Ross in lieu of the provisions in her favor contained in said contract of marriage settlement, and Mrs. Ross is willing to renounce and revoke the provisions of said marriage settlement in her favor and to accept in lieu thereof the provisions for her benefit and support hereinafter contained in this agreement." Mrs. Ross then expressly revoked all conditions or provisions contained in the contract of marriage and all benefits which might accrue to her under the marriage contract.

For about ten years the trustee carried out the provisions of the trust indenture. During that time no one questioned its validity. In 1926 Ross retained a Montreal barrister to draw up a will. He told the barrister of the provision he had already made for his family. The barrister promptly told Ross that the trust indenture was patently invalid under the law of Quebec, and so notified the trustee. By that time most of the estate which Ross had received from his father had been dissipated. Ross was deeply involved in speculations in oil stocks. He owed large sums to some Baltimore banks. He informed the Baltimore banks that the trust he had created was invalid, and in consideration of his promise to bring legal proceedings to have the trust set aside and to deliver the trust property to the banks as collateral, they agreed not only to extend the existing loans but to make new loans to Ross. He secured the signatures of his wife and children to written consents to revoke the trust. Ross then began an action to set aside the trust on the ground that it was void at its inception and a second action for

the revocation of the trust upon the consent of the interested parties.

After the actions were commenced, a petition in bankruptcy was filed against the plaintiff and the trustee in bankruptcy was substituted in his place. The defendants in the first action assert that under the law of New York the conveyance is valid and should be enforced here. In the second action they assert that the signatures to the consents to revoke the trust were obtained by misrepresentations and that issue of the settlor's children, born and unborn, have an interest in the trust. Both actions were tried together. They resulted in a judgment in favor of the plaintiff in the first action, and a judgment on the merits in favor of the defendants in the second action. Appropriate findings were made in each action. Upon appeal the Appellate Division reversed the judgment in the first action and upon new findings dismissed the complaint upon the merits. It affirmed the judgment in the second action.

The situs of personal property in a jurisdiction other than that where the owner of the property is domiciled has given rise to many difficulties and perplexities. The maxim " *mobilia sequuntur personam* " cannot always be carried to its logical conclusion. Practical considerations often stand in the way. Physical presence in one jurisdiction is a fact, the maxim is only a juristic formula which cannot destroy the fact. Within territorial limits, the jurisdiction of the courts of each state or nation is limited only by constitution or treaty. The courts of each jurisdiction determine all judicial questions by the law of that jurisdiction. When the owner of personal property authorizes its removal from his domicile or acquires property elsewhere, he must be deemed to know that his property comes under the protection of, and subject to the laws of the jurisdiction to which it has been removed, and that appeal may be made to the courts of that jurisdiction for the determination of conflicting rights in such

property. The law of his domicile may be different from the law of the state or nation in which the personal property is placed. A conveyance of the property may be valid under the laws of one jurisdiction and void under the laws of the other jurisdiction. If the courts of each jurisdiction determine such questions according to their own law then transfers of property become complicated and restricted in effect. A title, valid here, may be lost when the property is removed to another jurisdiction. Such a situation would obviously be intolerable. Therefore the rule has become engrafted in the law of every jurisdiction that in some circumstances its courts must determine questions submitted to them by the rules of law applied in some other jurisdiction. To that extent foreign law is applied but as part of our own law. (See articles by Professor Beale, 23 Harvard Law Review, 260, and 45 Harvard Law Review, 969.) Though public policy and comity may be decisive in the determination of what law shall be applied in given circumstances " it does not belong to the judges to recognise or to deny the rights which individuals may claim under it, at their pleasure or caprice; but, it having obtained the force of law by user and acquiescence, it belongs only to the political government of the State to change it whenever a change becomes desirable." (*Parsons* v. *Lyman,* 20 N. Y. 103, 112.) Here, as in other branches of the law, there should be certainty of rule and uniformity of application, and we must look to the judicial decisions and legislative enactment for guidance.

The courts of the various jurisdictions have with substantial unanimity adopted certain rules. " Capacity to make a valid conveyance of a chattel is determined by the law of the state where the chattel is situated at the time of conveyance." (American Law Institute, Tentative Restatement, Conflict of Laws, § 275.) " The essential validity of a conveyance of a chattel is determined by the law of the state where the chattel is situated at the

time of the conveyance." (§ 277.) In this State these rules have long been applied to the conveyance of tangible chattels. More recently, we have indicated that the rule should be applied to negotiable paper instruments. " Bills and notes were developed under the law merchant as convenient instrumentalities of trade and commerce. They pass from hand to hand by indorsement and delivery and properly are governed by the rule relating to the transfer of tangibles. The rule of international law, that the validity of a transfer of movable chattels must be governed by the law of the country in which the transfer takes place, applies to the transfer of checks or bills of exchange by indorsement." (*Weissman* v. *Banque de Bruxelles*, 254 N. Y. 488, 494, opinion by POUND, J.)

For the same reasons the rule should be and generally is applied to other intangible personal property, at least when " no one can get the benefits of ownership except through and by means of the paper " which evidences such intangible property. (*Disconto-Gesellschaft* v. *United States Steel Co.*, 267 U. S. 22, 28.) Intangible property, like shares of corporate stock or debts, may for practical purposes be merged and embodied in documents like stock certificates or bonds, which like bills and notes are " instrumentalities of trade and commerce." " They pass from hand to hand and properly are governed by the rule relating to the transfer of tangibles." (Cf. American Law Institute, Tentative Restatement, Conflict of Laws, §§ 53, 57, 281, 282.) Such documents and the personal property merged or embodied in them have, like tangible chattels, a situs apart from the domicile of the owners. Under the Constitution of the United States, such situs may be insufficient to empower the State, where such documents are situated, to impose a property tax on them, though the owner resides in a sister State of the Union. (*Farmers Loan & Trust Co.* v. *Minnesota*, 280 U. S. 204; *First Nat. Bank* v. *Maine*, 284 U. S. 312.)

Nevertheless the physical presence of such documents

gives the State jurisdiction over them in other respects. (*Burnet* v. *Brooks*, 288 U. S. 378.) Judicial decisions affecting the situs of choses in action or intangible property not embodied or merged in a mercantile document are not in point. (Cf. *Matter of Anziani*, [1930] 1 Ch. 407, and *Republica de Guatemela* v. *Nunez*, [Court of Appeal, 1927] 1 K. B. 669.) We are dealing with a conveyance in trust of documents which in the market-place are treated as property and not merely evidence of property (Cf. *Pierpoint* v. *Hoyt*, 260 N. Y. 26), and consider no other question.

The rules that both the capacity to make a valid conveyance of tangible chattels and securities and the essential validity of such conveyance are determined by the law of the State where the chattel is situated at the time of the conveyance have been generally applied to conveyances *inter vivos*. They are not generally applied to passage of title by will or the intestacy of a decedent owner. With possible limitations, not relevant to the question here presented (Cf. *Chamberlain* v. *Chamberlain*, 43 N. Y. 424; *Hope* v. *Brewer*, 136 N. Y. 126; *Cross* v. *United States Trust Co.*, 131 N. Y. 330), the rule is well established that the essential validity of a testamentary trust must be determined by the law of the decedent's domicile, and the same rule often is applied to trusts established as part of a marriage settlement. The plaintiff urges that the same rule should be applied to a conveyance in trust *inter vivos*, especially where such trust is established for the benefit, of the wife and children of the settlor.

It cannot be gainsaid that there are expressions in the opinions of the courts of this State which support the plaintiff's contentions. In considering the effect of these expressions, we must give due weight to the circumstances under which they were made. The paucity of old judicial decisions upon conveyances in trust *inter vivos*, compared with the number of decisions upon testamentary trusts, shows that conveyances in trust *inter vivos* were com-

paratively rare. Thus the possible importance of drawing distinctions between the rules applicable to testamentary trusts and trusts *inter vivos*, was not apparent or brought to the attention of the courts. Moreover the maxim "*mobilia sequuntur personam*" was more rigidly and uniformly applied in earlier days. The conflict between fact and maxim then seemed less important. Today the courts cannot close their eyes to the fact that trusts of personal property and securities are created by settlors during their lifetime for many purposes, and for the first time our court is called upon to decide directly the question whether conveyances in trust of securities made *inter vivos* shall be governed by the same rules as testamentary trusts or by the same rules as other conveyances *inter vivos*.

Analogy furnishes no satisfactory guide, for analogy in either case is imperfect and incomplete. Dicta in earlier opinions are certainly unreliable, because the rule announced is assumed rather than considered. Nevertheless the fact that the rule has been assumed is not without significance.

We have considered all the cases in this State, called to our attention, which deal with trusts *inter vivos*, even though space forbids complete analysis here. They have been painstakingly analysed in the valuable article by Professor Cavers (" Trusts *Inter Vivos* and the Conflict of Laws, 44 Harvard Law Review, 161). In *Sullivan* v. *Babcock* (63 How. Pr. 120) the court, at Special Term, sustained a conveyance in trust of personal property in the State of New York on the ground that such conveyance was valid in New Jersey where the settlor resided and where the trust indenture was executed. The case was not appealed to this court and is significant mainly because the court apparently relied, as authority for the rule applied, exclusively on Story on Conflict of Laws, which asserts broadly " that the laws of the owner's domicil should in *all* cases determine the validity of

*every* transfer, alienation, or disposition made by the owner, whether it be *inter vivos,* or *post mortem.*" (§ 383.) (Italics are ours.) In *Townsend* v. *Allen* (59 Hun, 622; affd., without opinion, 126 N. Y. 646) the court at General Term again assumed that this was the law, but there the decision was that the conveyance in trust was valid under the New York rules as well as under the rules of the settlor's domicile. That was true also in *Maynard* v. *Farmers Loan & Trust Co.* (208 App. Div. 112), and this court in affirming the judgment (238 N. Y. 592), expressly indicated that affirmance was not based on the reasons given in the Appellate Division. Thus in the cases in this court which passed upon the validity of trusts *inter vivos,* we find no direct decision upon this question and little, if any, indication as to what rule should be followed.

There are, however, dicta in opinions in this court in cases dealing with testamentary trusts, which do indicate that, at least, at the time when these cases were decided this court would have applied the same rules to trusts *inter vivos* as to testamentary trusts. (*Parsons* v. *Lyman; supra; Cross* v. *United States Trust Co.,* 131 N. Y. 330; *Dammert* v. *Osborn,* 140 N. Y. 30.) That is the construction which courts of other jurisdictions have placed upon these dicta. (*Liberty Nat. Bank & Trust Co.* v. *New England Investors Shares, Inc.,* 25 Fed. Rep. [2d] 493; *Swetland* v. *Swetland,* 107 N. J. Eq. 504, affg. 105 N. J. Eq. 608.) None the less, now that we are called upon to decide that question, we must weigh other considerations not then apparent to the courts which seem to point logically to the need for differentiation between the rule to be applied to testamentary trusts and the rule to be applied to trusts *inter vivos.*

In all the affairs of life there has been a vast increase of mobility. Residence is growing less and less the focal point of existence and its practical effect is steadily diminishing. Men living in one jurisdiction often conduct their affairs in other jurisdictions, and keep their securi-

ties there. Trusts are created in business and financial centers by settlors residing elsewhere. A settlor, regardless of residence, cannot establish a trust to be administered here which offends our public policy. If we hold that a non-resident settlor may also not establish a trust of personal property here which offends the public policy of his domicile, we shackle both the non-resident settlor and the resident trustee.

Our courts have sought whenever possible to sustain the validity even of testamentary trusts to be administered in a jurisdiction other than the domicile of the testator. (Cf. *Chamberlain* v. *Chamberlain*, 43 N. Y. 424; *Hope* v. *Brewer*, 136 N. Y. 126; *Cross* v. *United States Trust Co.*, *supra; Dammert* v. *Osborn*, 140 N. Y. 30.) In regard to other conveyances or alienations of personal property situated here, they have steadfastly applied the law of the jurisdiction where the personal property is situated. The maxim that movable personal property follows its owner is restricted to the field within which the State, where that property is found, chooses to apply other laws than its own, and modern conditions have caused a limitation of that field to narrow bounds. That is true in other jurisdictions as well as here. Where a non-resident settlor establishes here a trust of personal property intending that the trust should be governed by the law of this jurisdiction, there is little reason why the courts should defeat his intention by applying the law of another jurisdiction. (Cf. Dicey on Conflict of Laws, [4th ed.] pp. 591 and 713.)

We balance the weight of such considerations against the weight of the dicta in old cases. We may throw in the balance also expressions of public policy by the Legislature of this State. It has provided that: " Whenever a person being a citizen of the United States, or a citizen or a subject of a foreign country, wherever resident, creates a trust of personal property situated within this State at the time of the creation thereof, and declares in

the instrument creating such trust that it shall be construed and regulated by the laws of this State, the validity and effect of such trust shall be determined by such laws." (Pers. Prop. Law; Cons. Laws, ch. 41, § 12-a.) It is true that the statute was enacted long after the creation of the trust now the subject of this litigation and the validity of the trust must, probably, be determined by the law as it then existed. The statute does not change retroactively a well-established rule of law. It merely establishes a definite public policy in a field where the rules of law were still fluid and undefined. When the courts are called upon to define these rules even as of an earlier date, they cannot entirely disregard this public policy. (Cf. *Dammert* v. *Osborn*, *supra*.) The Legislature has made simpler the choice between possible rules even if it could not dictate such choice.

It is said that the statute establishes a public policy only where there is an express declaration of intention in the instrument that it shall be construed and regulated by the laws of this State. Here there is no express declaration of intention, but the intention is implied in every act and word of the parties. The statute makes express declaration of intention conclusive, but a construction which would deny effect to intention appearing by implication would be unreasonable. Indeed, since the statute in terms applies even to residents of this State, such construction would be almost impossible. It follows that the validity of a trust of personal property must be determined by the law of this State, when the property is situated here and the parties intended that it should be administered here in accordance with the laws of this State.

The instrument creating the trust is not, in form, merely an assignment of personal property upon specified trusts, nor is it merely an agreement between the settlor and the trustee. Mrs. Ross is a party to the instrument, and at least in form it constitutes, in addition to a deed or

conveyance in trust, an agreement between wife and husband whereby she consents to revoke any and all conditions or provisions for her benefit and support contained in the said contract of marriage settlement dated January 28th, 1902, and does for herself, her heirs, executors and administrators and assigns renounce any and all benefits which might accrue to her under the provision of said marriage settlement.

Though the validity of the conveyance in trust be determined by the law of the State of New York, there can be no doubt that the validity of the provisions of the agreement for the revocation of the contract of marriage settlement and for the renunciation of the benefits which might accrue to the defendant under the marriage settlement must be determined by the law of Quebec. There the parties were domiciled and there the marriage contract was made and will be enforced. In the Province of Quebec these provisions of the agreement will be given no effect. The attempted renunication of the marriage settlement is a futile act, and the courts of this State are powerless to give it effect. The parties to the contract by appeal to our courts have subjected themselves to the jurisdiction of those courts, but the decrees of our courts have no extraterritorial effect and cannot alter the domiciliary marital status of parties not domiciled here, or direct the courts of the jurisdiction where the parties are domiciled in the enforcement of marital rights there.

There is, nevertheless, no rule of law which would preclude the courts of this State from determining in accordance with the rules of law of this jurisdiction, the validity of a conveyance of real or personal property contained in a bilateral agreement, even though the remainder of the agreement be governed by, and is void under, the law of another jurisdiction, provided the conveyance be separable from the other parts of the contract. Concededly that would be true if the conveyance were of real estate here. It is equally true of personal property

situated within the jurisdiction of our courts. Here we are free to apply our law rather than the law of another jurisdiction.

The difficulty in this case is that on the face of the contract the conveyance in trust seems to have been made, at least partly, in consideration of the revocation of the provisions of the marriage contract and according to the recitals " in lieu of the provisions * * * contained in said contract of marriage settlement." Though an executed deed or conveyance in trust requires no consideration (*Stiebel* v. *Grosberg*, 202 N. Y. 266), yet if made for a promised consideration which fails, the conveyance may be revoked. Though apparently that question has never heretofore been presented to any court, it would seem clear that a conveyance valid under the law of New York, might be unenforceable and subject to rescission if the consideration fails because the laws of Quebec effectually preclude the enjoyment of the promised consideration. Upon the face of the agreement the wife's renunciation is the consideration for the husband's conveyance in trust. Invalidity in either, it is said, renders the other unenforceable or subject to rescission.

The Appellate Division has, however, found that the defendant Mrs. Ross never " knowingly consented to revoke any of the conditions or provisions for her benefit contained in the said marriage settlement, and never knowingly renounced any benefit which might accrue to her thereunder " and that " no consent to revoke, or agreement to renounce, or renunciation, by the defendant Ethel Adine Ross * * * was intended to induce, or did induce, the plaintiff Ross to transfer the securities " included in the trust. The evidence on this point was elicited from the parties themselves. It could not be directly contradicted, and is sufficient to sustain the findings even though perhaps not sufficient to justify a reformation of the written agreement. It does not appear, and the court has not found, that the plaintiff Ross did

not understand that the agreement included a consent to revoke or an agreement to renounce or renunciation by the wife, even though such consent or renunciation was neither " intended to induce, or did induce " the transfer of the securities and it does not appear, and the court has not found, that the defendant, his wife, did not know the contents of the agreement she signed, even if she did not understand its effect. No reformation was prayed for in the pleadings and no reformation was decreed by the court. The force of the findings must be limited accordingly.

The plaintiff maintains that so limited they are irrelevant and immaterial. That raises a novel question. Deeply imbedded in the judicial decisions of every common-law jurisdiction is the rule that the terms of a written agreement cannot be varied by parol and that in construing the agreement " it is not the real intent but the intent expressed or apparent in the writing which is sought." (2 Williston on Contracts, § 610.) Thus, except for the purpose of having a contract reformed, a party to a written agreement may not assert its validity and at the same time deny that the writing embodies the actual contractual rights and obligations which the parties intended to make. The written agreement defines conclusively the contractual rights and obligations of the parties. It does nothing more. Recitals, even recitals of consideration, unless intended themselves to embody a contractual right or obligation, may be contradicted. " The consideration of a written instrument is always open to inquiry, and a party may show that the design and object of the agreement was different from what the language, if alone considered, would indicate." (*Baird* v. *Baird*, 145 N. Y. 659, 664; Cf. *Juilliard* v. *Chaffee*, 92 N. Y. 529.) The principle precludes denial, limitation or extension of a contractual right embodied in a writing. It extends no further. (*McCrea* v. *Pairmount*, 16 Wend. 460.) Here there is no such attempt. The plaintiff seeks

to destroy the agreement as written, the defendant seeks to uphold it. The renunciation is ineffective because it could take effect only in Quebec, and under the law of that jurisdiction it is void. The conveyance in trust takes effect here and is valid under the laws of this State; though, perhaps, subject to rescission if the consideration has failed. The defendant has not asked the court to reform the agreement so as to show that she did not renounce the benefit of the provisions of the marriage contract, and the court has not of its own motion granted such relief. If the renunciation were valid, then there could be no claim of failure of consideration. If void, then reformation could not change the contractual rights of the parties to the agreement. What the wife claims and what the court has found is that she did not understand that she was giving up any rights under the marriage settlement, and that the husband was not induced to make the conveyance for the anticipated consideration of a valid renunciation. The courts of New York may enforce the conveyance as made by the plaintiff Ross in accordance with the laws of New York. They leave to the courts of Quebec the validity or invalidity of the renunciation of the defendant his wife. They refuse to rescind the conveyance for failure of consideration because conveyance and renunciation were not made in exchange for each other and are not interdependent, and thus there is no basis for the equitable remedy of rescission. In so doing they permit no alteration of the obligations of either party as defined by the contract. At most there is contradiction of the parts of the agreement which, like recitals, are not contractual in form or essence.

The decisive consideration on this branch of the case is not whether the defendant intended to renounce the benefit of the marriage contract but whether the failure of such intention requires the court to apply the law of another jurisdiction to the conveyance of property situated here or creates an equitable right in the plaintiff to rescind the conveyance. The parties undoubtedly

intended that the law of this jurisdiction should be applied to the conveyance in trust; though they must have intended that the validity of the renunciation should be determined by the courts of their domicile according to the domiciliary law, for no other court could have jurisdiction over the contract of marriage settlement. The plaintiff has no right to set aside the conveyance in trust on the equitable ground of unjust enrichment, for it appears that the renunciation was not the inducement for the conveyance in trust. Indeed, when we note that the remaindermen under the trust conveyance were not even parties to the agreement between husband and wife, it may well be doubted whether the trust agreement could be set aside as to them for failure of consideration. Finally, it is to be noted that the plaintiff has not asked for rescission.

In the second action brought to revoke the trust with the alleged written consent of all the interested parties, the plaintiff, indeed, describes the instrument creating the trust only as a " trust deed." Interesting questions are raised in that action as to whether unborn or infant parties may not have an interest in the trust. We do not reach those questions, for the courts below have found that the consents which have been signed by the wife and children were obtained by misrepresentation. The trier of the fact, on the evidence produced, might reasonably have refused to make such findings. We cannot say that there is no evidence to sustain them. The doctrine that those who negligently sign an instrument without reading it may be estopped or precluded from showing that in fact they never assented to its terms (*Pimpinello* v. *Swift & Co.*, 253 N. Y. 159) does not apply here.

The judgment in each action should be affirmed, with costs.

KELLOGG, J. (dissenting). The trust instrument is self-styled an " Agreement " to which the plaintiff John

K. L. Ross is "party of the first part," his wife, the defendant Ethel Adine Ross, is "party of the second part," and the defendant the Equitable Trust Company of New York is "party of the third part." It recites that John K. L. Ross and Ethel Adine Ross, on or about the 28th day of January, 1902, entered into a certain contract of marriage settlement, whereby certain provisions were made for the benefit and support of Mrs. Ross. It further recites that Mr. Ross has become possessed of ample means and is desirous of making suitable provision for Mrs. Ross "in lieu of the provisions in her favor contained in said contract of marriage settlement" and that Mrs. Ross is willing "to renounce and revoke" the provisions of said marriage settlement in her favor and "to accept in lieu thereof" the provisions for her benefit "in this agreement." The instrument then provides: "That in consideration of the sum of One Dollar ($1.00) lawful money of the United States, to her in hand paid by Mr. Ross, and other valuable considerations, receipt whereof is hereby acknowledged, Mrs. Ross does hereby consent to revoke any and all conditions or provisions for her benefit and support contained in the said contract of marriage settlement dated January 28, 1902, and does for herself, her heirs, executors, administrators and assigns renounce any and all benefits which might accrue to her under the provisions of said marriage settlement." In consideration of the foregoing, "Mr. Ross hereby gives, assigns, transfers, and sets over unto the said trustee all of the securities described in Schedule ' A ' hereto annexed, which is hereby made a part hereof." The instrument was executed by Mrs. Ross, Mr. Ross and the Equitable Trust Company. We thus have the expression of present performance of a jural act by Mrs. Ross and the expression of performance of a similar act by Mr. Ross. Mrs. Ross " does hereby consent to revoke any and all conditions or provisions for her benefit and sup-

port contained in the said contract of marriage settlement dated January 28th, 1902." She does presently "renounce' any and all benefits which might accrue to her under provisions of said marriage settlement." Mr. Ross expresses a present transfer to the Equitable Trust Company of all the securities enumerated in Schedule A. Mrs. Ross could no more avoid her present renunciation, were it a legal act, by claiming that she never read the document, than could Mr. Ross avoid the effect of his present transfer by a similar assertion. It is universally the law that the signer of an instrument is bound by its express terms whether aware of its contents or otherwise. It is thus stated by Professor Wigmore: "Where a jural act is executed by *signing* a specific and *complete* document, the second party has a right to treat the signed contents as representing the terms of the act. The principle of reasonable consequences plainly requires this result. That the signer did not intend to execute such terms is immaterial; and whether the lack of intent was due to a failure to read it over, or to some other cause, is immaterial. In other words, his individual innocent mistake or deliberate secret dissent cannot be shown. Such may be taken to be the general rule." (5 Wigmore on Evidence, § 2415.) "Ordinarily, the signer of a deed or other instrument, expressive of a jural act, is conclusively bound thereby. That his mind never gave assent to the terms expressed is not material." (*Pimpinello* v. *Swift & Co.*, 253 N. Y. 159, 162.) If any other rule prevailed, not a deed in any clerk's office, not a note in any bank would conclude the signer; a mere statement by him that he did not read them before he signed might be sufficient to deny to them all force. The only instance in which the signer may escape is expressed by us to be as follows: "If the signer is illiterate, or blind, or ignorant of the alien language of the writing, and the contents thereof are misread or misrepresented to him by the other party, or even by a stranger, unless the signer be negligent, the writing is

void." (*Pimpinello* v. *Swift & Co.*, *supra*, p. 163.) In support of the proposition we cited *Cleary* v. *Municipal Elec. Light Co.* (19 N. Y. Supp. 951; affd., 139 N. Y. 643); *Wilcox* v. *American Tel. & Tel. Co.* (176 N. Y. 115); *Smith* v. *Ryan* (191 N. Y. 452); *Whipple* v. *Brown Bros. Co.* (225 N. Y. 237); *Thoroughgood's Case* (2 Coke, 9); *Shulter's Case* (12 Coke, 90); *Foster* v. *Mackinnon* ([L. R.] 4 C. P. 704); *Trambly* v. *Ricard* (130 Mass. 259). Mrs. Ross does not claim that she was ignorant or blind or that the contents of the document were misrepresented. Did she make such a claim, and were she successful, the measure of the relief to be accorded her would be a rescission of the document, precisely the relief which the plaintiff now seeks. We thus have a document, conclusive upon all the parties signing, expressing an exchange, presently made, of an act of one party for the act of another party. That an exchange was intended, that the performance of the one act by one party was conditional upon the performance of another act by the other party is clearly stated. The new trust conveyance is expressed to be " in lieu of the provisions in her favor contained in said contract of marriage settlement." Mrs. Ross agrees to " accept in lieu " of the marriage contract the provisions of the new agreement. It has been said that it is sheer folly to think that the renunciation of an interest in a trust fund of $125,000 can be intended as a *quid pro quo* for the gift of an interest in a trust fund of $1,000,000. There are two answers thereto. In the first place, the adequacy of a consideration is never a question for the courts. " Parties may think some matter, apparently of very little importance, essential; and if they sufficiently express an intention to make the literal fulfilment of such a thing a condition precedent, it will be one." (Williston on Contracts, § 824.) In the second place, if the renunciation fails of effectiveness, the new trust will operate, not to confer upon the wife an additional interest in $875,000 of trust securities, but in a new fund of

$1,000,000 without deductions, which would be more than the settlor ever intended to establish as the aggregate fund to be enjoyed by his wife. Concededly, the validity of any modification of the marriage settlement must be judged by the law of the marital domicile. Concededly, under the laws of Quebec, the renunciation will have no effect. Therefore, if the new trust be upheld, in Quebec the beneficiary of the early settlement may continue to enjoy the benefit of a fund of $125,000, while in New York she may enjoy an interest in a trust fund in $1,000,000. Thus, if the majority of this court be right, the result of the conflict of laws in the two jurisdictions will be that Mrs. Ross will have an interest in an aggregate fund of trust moneys amounting to $1,125,000, when the settlor, by word or deed, never indicated his volition that the aggregate sum should exceed $1,000,000. To the extent of the additional sum, not her husband, but the courts, dealing with his property contrary to his expressed intention, will have been her benefactors.

For these reasons, without going into the merits of the question whether the laws of this State or the laws of Canada should be applied herein, which I think extremely doubtful, I dissent from the decision to be made by the court.

POUND, Ch. J., CRANE, O'BRIEN and HUBBS, JJ., concur with LEHMAN, J.; KELLOGG, J., dissents in opinion in which CROUCH, J., concurs.

Judgments affirmed. (See 262 N. Y. 643.)