# Richmond

## T. Bryan Tate, Trustee, Etc. v. Cecelia Halberstadt Hain, et als.

April 26, 1943.

Record No. 2649.

Present, Campbell, C. J., and Holt, Hudgins, Browning, Eggleston and Spratley, JJ.

The opinion states the case.

*Brown & Garrett*, for the appellant.

*Crews & Clement* and *Meade & Talbott*, for the appellees.

. PER CURIAM.

The opinion of the trial judge, which follows, sufficiently states the issue and the reasons which support the decree complained of, and, therefore, it will be affirmed.

"The Metropolitan Life Insurance Company, its Home Office being in the City of New York, issued four policies of insurance on the life of Joseph Halberstadt, all providing that payments to the beneficiaries were to be made at its Home Office.

"No. 830032-A was issued on March 22, 1912, had a face value of $2,000 and was payable to Joseph Halberstadt on the 22nd day of March, 1969, if he were then living, and if not, to Bessie Halberstadt, his wife. Application for this policy was made at Philadelphia, Pa., where the insured then resided. The record is silent as to whether it was delivered to insured in that city, and as to what acts were done there to complete the execution of the contract. I infer, however, that in accordance with the usual custom of insurance companies, the policy was sent to Philadelphia and there delivered to insured by some representative of the company upon payment of the first premium.

"No. 5081321-A was issued on September 28, 1927, had a face value of $5,114, and was payable to Bessie Halberstadt, wife of the insured. Application for it was made at Belhaven, N. C., where the insured then resided and was domiciled. Premium receipt covering the first premium was countersigned by one, Noble, 'Agt.,' and it appears that this was done in North Carolina, since the policy was handled through the Washington, N. C., District.

"No. 5815807-A was issued on May 16, 1929. It provided for one payment of $28.65 to the insured, if living, on the

16th day of May, 1968, and for two hundred and thirty-nine monthly payments thereafter of like amount, or upon his death for like payments to his daughter, Cecelia. This policy was applied for at Belhaven, N. C., and I infer that it was there delivered by some representative of the Insurer upon payment of the first premium.

"No. 5927868-A was issued on July 8, 1929, and is similar to No. 5815807-A, except that the monthly payments provided for are in the sum of $57.30. This policy was applied for at Belhaven, N. C., and it is to be inferred that it was delivered there by some representative of the Insurer upon payment of the first premium.

"Insured also resided in North Carolina and was domiciled there when the last two mentioned policies were issued. (See exhibit, Certificate of Clerk of Beaufort County, N. C., filed with depositions.) Both of these policies contained a provision reading as follows: 'Any income payments yet to be made, commuted at the rate of three and one-half per centum per annum, compound interest, may be required to be paid in one sum as follows: (a) To the insured, if the Insured is the payee, but only with the written consent of the Beneficiary, if the right to change the Beneficiary has not been reserved, or (b) To the beneficiary after the death of the Insured, if such right has been given to the Beneficiary by the Insured. No Beneficiary may assign or commute income payments unless the Insured has so provided in writing and such provision has been endorsed on the Policy by the Company at its Home Office.' No such provision was made by the Insured.

"Bessie Halberstadt died in 1929.

"Cecelia Halberstadt was born January 28, 1912, and was the only child of Joseph and Bessie Halberstadt.

"On June 6, 1930, Joseph Halberstadt made Cecelia the beneficiary under policies Nos. 5081321-A and 830032-A, and on September 3, 1930, he executed as to both of these policies 'An Election of Installment Settlement—Option 2' at Belhaven, North Carolina, by which he directed that the amount payable under policies upon his death should be re-

tained by the Insurer, and paid out in monthly installments instead of in one sum. These elections contain a paragraph reading as follows:

" 'And I hereby further direct that the Beneficiary of Record shall not have the right at any time to commute, assign or encumber any stipulated payments yet to be made.'

"It is a matter having some bearing on the decision of the case that in the form signed by the Insured after the words 'Beneficiary of Record' appearing in the quoted paragraph, there is a blank space with directions in parentheses under it as follows: 'Fill in either "shall" or "shall not." '

"Joseph Halberstadt died in 1935.

"Cecelia Hain, then Halberstadt, registered as a voter in Danville, Virginia, in 1936; married Simon Hain, who was domiciled and residing in Danville, Virginia, in 1937; and was domiciled in and a resident of Virginia when she filed a voluntary petition in bankruptcy and was adjudicated a bankrupt in 1940.

"Through the agency of her husband she operated a business in the City of Danville, Va., under the style of Danville Shoe Market, after she was married, and had conducted the same business with him as Manager after her father's death and prior to her marriage. In 1936 she made a financial statement for the purpose of obtaining credit in which there was listed as an asset a trust fund of the value of $25,000. In March, 1939, she made a property statement to J. W. Carter Co. for the purpose of obtaining credit in which she listed among her assets: 'Trust Fund Metropolitan Life Insurance Co.......26,350.00.'

"At Danville, Va. on July 12, 1937, she made an agreement with the American National Bank & Trust Co. of that city, evidenced by a letter reading as follows:

" 'In consideration of your continuing to carry indebtedness totaling $8,500.00, which you have previously loaned me, and which I originally agreed to pay at a faster rate than I now find myself able to, I hereby assign and set over to you as security for this indebtedness, or any other indebtedness that I may owe your institution, all of my rights,

title and interest in and to Metropolitan Life Insurance Company contract No. 18113-R, Installment Certificate, in the principal amount of $29,128.80, payable at the rate of $121.37, in 239 monthly payments, beginning October 19, 1935.

" 'Since the Metropolitan Life Insurance Company will not accept an assignment of this policy, I am directing that they forward these installment checks to you each month to be placed to my credit.

" 'I hereby contract and agree with you that I shall, whenever requested to do so by you, endorse these checks over to you, and allow the entire proceeds to be applied as a credit on my indebtedness to your bank until such indebtedness is paid in full.

" 'In making this agreement, assignment and contract, it is my intent and purpose to prefer your bank ahead of any other creditors I may have in the disposition of this insurance, and it is my desire that all income to be derived from this policy be paid you until my indebtedness to you is liquidated in full, and I hereby agree to hereafter make such further contracts as may be necessary to legally perform this contract.'

"After the death of Joseph Halberstadt the Insurer issued to Cecelia the certificate referred to in the agreement with the Bank above quoted, by which it agreed in accordance with the provisions of the policies and the options exercised by the insured to pay her the sum of $121.37 a month. This certificate contained a provision against assignment, etc. It also provides that in the event of the death of the payee before receiving all the payments the remaining payments shall be commuted at the rate of three and one-half per centum per annum compound interest and to be paid to the executors or administrators of the payee.

"With these facts as the basis for determination the question is: Did the payments due the bankrupt and to become due to her in her lifetime pass to her trustee in bankruptcy? In my opinion its answer determines the rights of the American National Bank & Trust Co., although some incidental

questions arise in this connection which will be briefly touched upon hereafter.

■ "Whether she could have transferred the payments due her from the Metropolitan Life Insurance Co. is a question of State law. *Eaton* v. *Boston &c. Safe Deposit Co.*, 240 U. S. 427, 36 S. Ct. 391; *Hull* v. *Farmer's Loan Co.*, 245 U. S. 312, 38 S. Ct. 103; *Suskin & Berry, Inc.* v. *James Rumley, Trustee*, 37 Fed. (2d) 304; Remington on Bankruptcy, Vol. 3, Supplement, 4th E., Sec. 1189.

"A New York statute reads in part as follows:

" 'Provided, however, that when the proceeds of a life insurance policy, becoming a claim by death of the insured, are left with the insurance company under a trust or other agreement, the benefits accruing thereunder after the death of the insured shall not be transferable, nor subject to commutation or incumbrance, nor to legal process except in an action to recover for necessaries, if the parties to the trust or other agreement so agree.'

"Three cases are strongly relied upon by Mrs. Hain in support of her contention that her right to the payments due by the Metropolitan did not and do not pass to her trustee in bankruptcy. They are *Annis* v. *Pilkewitz*, 267 Mich. 68, 282 N. W. 905; *Michaelson* v. *Sokolove* (Md.), 182 A. 458, and *The Citizens & Southern National Bank* v. *Mrs. Frank Palmer and Aetna Life Insurance Co.*, an unreported decision made by the Municipal Court of Savannah. They are pretty closely in point with this case, although the facts are somewhat different. In the Michigan case the agreement by which the funds were left with the company was made specifically with reference to the New York statute. The point was made by the attaching creditor that exemptions had no extra-territorial effect, but were of the remedy, not the right; the court denied this claim, stating that the rights of the parties were established by contract. That, although the contract creating the exemption was authorized by statute, nevertheless the exemption arose from the act of the parties and not out of the statute. The holding is to the effect that as the agreement contravened no public policy of the State

of Michigan, and was made with intent that it should be governed by New York law and in accordance therewith the Michigan courts must recognize that law as controlling. The Georgia case follows the decision in the Michigan case. The Maryland case bases its decision upon the reasoning that the result of the agreement was in effect a spendthrift trust; that such trusts were recognized as valid in Maryland; and that, therefore, the funds left in the hands of the insurance company were not assignable. It gives no consideration to the conflict of laws question.

"In these three cases the agreements were plainly made with reference to the laws of other States. That point is not quite so clear in the instant case. If Halberstadt contracted with reference to the laws of New York, I think that the result is that the payments due his daughter do not pass to her trustee in bankruptcy.

" '*Rule Making Intent of Parties Determinative.* Under one theory the conflict between the various rules and theories that have been stated is more apparent than real, since the majority of them, perhaps may be reconciled by the application of another rule, namely, that the true test for the determination of the proper law of a contract is the intent of the parties and that this intent whether express or implied, will always be given effect except under exceptional circumstances evincing a purpose in making the contract to commit a fraud on the law.' Am. Jur., Vol. 11, Sec. 119, Conflict of Laws.

"Many authorities are cited in support of the text among them the Virginia decision of *Pool* v. *Perkins*, 126 Va. 331, 101 S. E. 240. See also Minor's Conflict of Laws, Sec. 159, where this appears:

" 'The *locus solutionis* of a contract primarily depends upon the intention of the parties. It is a part of the principle of freedom of contract to choose the place where a contract shall be performed. This choice may be expressed in the contract itself; if not, it may be inferred from the surrounding circumstances.'

"There was no express reference made to the law of New York in the policies or in the option elections. True it is, that the proceeds of the policies were payable· in New York, a fact of considerable import in this case when taken in connection with its other facts. See Minor on Conflict of Laws, section 166. I entertain some doubt, though, as to whether this isolated fact in all cases should carry any particular weight. Certainly it would seem to go pretty far to hold that a buyer of insurance should be bound by the laws of a State about which he knew nothing, merely because the policy contained such a provision. See *Metropolitan Life Insurance Co.* v. *Benton*, 56 Ga. App., 298, 302.

"Let us look to the other facts presented by the record. Halberstadt had one daughter, Cecelia. He owned other property, a part of which he devised to her. Shortly after two of the policies were bought he exercised the elections providing for installment payments. The policies originally made payable to his daughter after his death contained restrictions against assignment of the payments or their commutation. There is no doubt in my mind that a man of business considered these propositions and that he had a well formed purpose to insure his daughter a monthly income for a period of twenty years after his death—one of which she could not be deprived. The option election left the determination of this matter to the insured. It was not a conventional stipulation against assignment without consent of one of the parties. It was not inserted as a mere convenience to the Insurer with respect to ascertaining the validity of assignments, the identity of assignees &c. The restrictions as to the payments were imposed with a definite object. The fund, the debt, whatever you may call it, had its situs, from a practical standpoint, in New York. And it is an inescapable inference that Halberstadt did not intend that the proceeds of his insurance, so far as his daughter was concerned, should be dependent on the laws of any jurisdiction in which she might later reside or be domiciled. To accomplish his purpose, definiteness as to the law governing the rights and interests of the object of his bounty were of the very essence of his

scheme. She was then a young girl. It is to be deduced that there were no strong ties of affection between her and her stepmother. This was no doubt known to Halberstadt. The facts surrounding her movements after her father's death bear out this conclusion. All the facts show that Halberstadt had no reason to think that his daughter would continue to live in North Carolina. All in all, it seems plain that the agreements between him and the Metropolitan were made with intent that the New York law should govern them, and further with reference to the provisions of its statute affording an exemption.

"The question arises as to why the contracts between Halberstadt and his Insurer did not follow the language of the statute with reference to exemption from legal process—not that failure in this respect changes the legal result. See the case of *Crossman* v. *Rauch*, 263 N. Y. 264, 188 N. E. 748, holding that as the payments could not be voluntarily assigned they could not be subject to levy by execution. This reason for its conclusion was not based on the statute. It appears to be the law of New York, and if the contracts in issue are governed by it, it is controlling in this case. But the omission may lead to doubt as to what law the parties intended to contract with reference to. Some amount of doubt arises about almost everything. In the absence of doubt there is no room for decision, and I think it plain that, on the whole, the parties intended that New York should be the place of performance of their contracts. Consequently they are governed by its laws.

"If the agreements be held to create a trust relationship other questions arise. The trust would be subject to the laws of North Carolina, the domicile of the settlor; the laws of New York, or the laws of Virginia, the domicile of the *cestui que trust*. Decisions are in conflict on this point. See *Hutchinson* v. *Ross*, 262 N. Y. 381, 187 N. E. 65, 89 A. L. R. 1007 and note appended.

\*     \*     \*     \*     \*     \*

"I think that the rule laid down in *Hutchinson* v. *Ross, supra*, controls this case, and that, therefore, although the

transactions between Halberstadt and the Insurance Company be regarded as creating a spendthrift trust, one authorized by the New York statute as to insurance funds, that that New York law is controlling—unless it be so much in conflict with the public policy of Virginia that it would not be given recognition in its courts. Albeit, the Virginia statute pertaining to trusts is one of public policy, it does not follow that the laws and statutes of another State to which the rights of the parties are subject will, for that reason, be disregarded. There must be something immoral, shocking to one's sense of right, in order that comity be denied. *International Harvester Co.* v. *McAdams*, 142 Wis. 114, 124 N. W. 1042, 26 L. R. A. (N. S.) 774; 20 Ann. Cas., 614. It would indeed be a hard rule if the law of the forum set at naught the provisions of an agreement, valid where made, or to be performed, simply because the rights of the beneficiary of it were drawn in question in its jurisdiction and local policy was different from that of the place of making or performance. Assuming, arguendo, that Halberstadt had received the proceeds of his insurance policies as matured endowments in the form of a check mailed to him in North Carolina, and had then gone to New York, cashed the check, delivered the currency to a trustee residing there to be held and paid to his daughter upon the same terms, conditions and restrictions as we find here, and the laws of New York, statutory, or otherwise formulated, recognized the validity of such a trust, is there any substantial difference in the essence of that transaction from what we find in this? A trustee *eo nomine* is not essential. *Thomas* v. *House*, 145 Va. 742. And let us suppose further that the beneficiary of the trust at the time of its creation, was not a resident of Virginia, but subsequently became a citizen of this State, and that fortuitously, or otherwise, the trustee became suable in a Virginia Court, should that court disregard the law of New York and apply its own? I think not. However this may be as a question of conflict of laws, under the Bankruptcy Act the trustee's title depends on the law of that place in which the *situs* of the *res* is, as to which the bankrupt's right or interest exists.

As to the *situs* of the *res*, see *Hutchinson v. Ross, supra*, also *Shannon* v. *Irving Trust Co.*, 275 N. Y. 95, 9 N. E. (2nd) 792, to the same effect.

"*Crossman & Co.* v. *Rauch, supra*, held that under similar circumstances the relationship was that of debtor and creditor. Whether the relationship be that of debtor and creditor, or one of trust, is a distinction without a difference. The New York statute authorizes the parties to give to the chose in action and to the debt the essential character and nature of a spendthrift trust. The result is the same, regardless of terminology.

"It is true as contended by complainant that exemptions to be allowed the bankrupt are governed by the law of. his domicile for six months, or the greater portion thereof, immediately preceding the filing of the petition. Sec. 6, Bankruptcy Act; *Reiter, ex parte Hanrahan*, 58 Fed. (2d) 631; certiorari denied 287 U. S. 652, 77 L. Ed. 563, 53 S. Ct. 116. But this applies to statutory exemptions, not to conventional limitations or restrictions upon the bankrupt's interest in or title to the thing in question. *Annis* v. *Pilkewitz; Eaton* v. *Boston &c. Safe Deposit Co.* and *Suskin & Berry, Inc.* v. *Rumley, Trustee, supra*. One is an incident of citizenship, the other of title or ownership.

"I am not unmindful of the rule to the effect that stipulations against assignment in contracts where the personal equation is not involved, are generally held not to apply to transfers by operation of law. *Central Trust Co.* v. *Chicago Auditorium*, 240 U. S. 581, 60 L. Ed. 811, 36 S. Ct. 412, L. R. A. 1917 B, 580. But that is where the stipulation is embraced in a two-party contract. So far as the title or interest of one of the parties in the fruits of the contract is concerned, there can be no limitation by contractual agreement upon them that will affect their transfer by operation of law. But in a contract such as those in question there are three parties involved, the insured, the insurer and the beneficiary. If the applicable law permits, the insured can dispose of the benefits of his contract, which is the money payable under the policy, upon such terms and

subject to such restrictions as will prevent its transfer by operation of law. The limitations imposed determine the quality and nature of the beneficiary's estate or interest.

"Complainant places great reliance upon the case of *Bass, Trustee,* v. *Prudential Insurance Company &c,* decided by the Circuit Court of Pittsylvania County in 1936. To its judgment holding that the Trustee was entitled to recover the installments a writ of error was denied. The judgment of a court of coordinate jurisdiction, until reversed by a superior court, perhaps should be followed by other courts of equal dignity in the same State (Am. & Eng. Encyc. of Law, Vol. 26, Title, *Stare Decisis,* page 165); especially when a writ of error is denied by the appellate tribunal. This is only true, however, when the facts are similar. The denial of a writ of error may grow out of many reasons. And it is only when exact similarity of facts is beyond dispute that it is entitled to weight. The facts in the case of *Bass, Trustee,* v. *Prudential &c., supra,* are quite different in many respects from those in this case. The New Jersey law does not seem to have been considered. The record fails to show that there was any statute of that State such as that of New York relied upon in this case. The beneficiaries were residents of Virginia. Indeed, the only point of similarity whatever is a provision of the policy to the effect that installment payments were to be unassignable. Apparently the case was tried on the theory that the law of Virginia was applicable, and under that law, even though the transaction was deemed to have created a spendthrift trust, it would not have prevented the payments passing to the Trustee, because it was not limited to the support of the beneficiaries. For these reasons and because of my conclusion that the parties in this case contracted with reference to New York law, I do not feel bound by the decision in the case referred to.

"My opinion is that the payments due from the Metropolitan Life Insurance Co. to the Bankrupt and those to become due during her lifetime do not pass to her Trustee in Bankruptcy. Any installments remaining unpaid at her death would. See *Sheridan* v. *Krause,* 161 Va. 873.

"From what has been said it follows that in my opinion the purported assignment to the American National Bank & Trust Co. passed nothing in the payments coming to Mrs. Hain. A decree may be prepared accordingly."

*Affirmed.*