854 F.2d 1316
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
Peter F. FALTINGS, Security Software of N.J., Inc., Security
Software of Marlton, Inc., James Corcoran,
Plaintiffs-Appellants,
v.
INTERNATIONAL BUSINESS MACHINES CORP., Defendant-Appellee.
 No. 87-1123.
 United States Court of Appeals, Fourth Circuit.
 Argued March 8, 1988.
Decided Aug. 4, 1988.
 
 Clayton E. Dickey (Edward A. McConwell; Robert C. Dunn, Cohen, Dunn & Sinclair, P.C. on brief) for Appellants; Paul C. Saunders (Richard W. Clary; Cravath, Swaine & Moore; Haynie S. Trotter; McGuire, Woods, Battle & Boothe on brief) for Appellee.
 Before JAMES DICKSON PHILLIPS and SPROUSE, Circuit Judges, W. EARL BRITT, Chief United States District Court for the Eastern District of North Carolina, sitting by designation.
 PER CURIAM:
 
 
 1
 This is an appeal from a judgment in favor of the defendant, International Business Machines Corporation (IBM), in a diversity action arising out of its termination of a contract for the retail distribution of IBM computer products. We find no reversible error and therefore affirm.
 
 
 2
 * In 1982, Peter Faltings and James Corcoran formed Security Software of New Jersey, Inc. (Security Software), for the purpose of operating a retail computer dealership. In May of 1982, Faltings and Corcoran signed a franchise agreement with Entre Computer Center, Inc. (Entre), a large chain of computer stores, and pursuant to that agreement, opened an "Entre Computer Centre" in Pinebrook, New Jersey (the Pinebrook store). Faltings and Corcoran wished to sell IBM personal computers at their Entre franchise store. In order to do so, they were required to enter into a separate contract directly with IBM, the Retail Dealer Agreement (the Agreement). Under the terms of the Agreement, Entre was to serve as a middleman between IBM and Security Software: Security Software would place orders for IBM products with Entre, which would convey them to IBM; IBM would then ship the products ordered to Entre for reshipment to Security Software. In 1983, Faltings and Corcoran formed another corporation, Security Software of Marlton, Inc. (Marlton) to operate a second Entre franchise store in Marlton, New Jersey (the Marlton store). To permit the Marlton store to sell IBM products, IBM and Security Software amended the original Agreement to allow Security Software to sell IBM products at a second location. Marlton itself did not enter into a separate Retail Dealer Agreement with IBM.
 
 
 3
 The controversy in this case centers around Security Software's sale of IBM computer products to resellers rather than end users. IBM claims the Agreement specifically forbade Security Software to sell to resellers; Faltings and Corcoran say the Agreement contained no such restriction. In any event, it is undisputed that Security Software did in fact sell massive amounts of IBM equipment--approximately $12 million in 1984 alone--into the so-called "gray market" for resale. In 1985, suspicious that Security Software was involved in the gray market, IBM conducted two detailed audits of the sales records at the Pinebrook store. The audits confirmed IBM's suspicions, revealing that nearly 80% of the Pinebrook store's sales from May 1984 to February 1985 had been to unauthorized resellers. Shortly thereafter, IBM notified Security Software that it was terminating its Retail Dealer Agreement on three months' written notice.
 
 
 4
 Approximately one year later, Faltings and Corcoran cancelled their franchise agreement with Entre and filed suit against Entre in the Eastern District of Virginia, claiming that Entre had misled them about the nature of their contract with IBM. That action was settled after an eight-day trial. Several weeks later, Faltings, Corcoran, Security Software, and Marlton (the plaintiffs) filed this action against IBM in the Eastern District of Virginia, asserting six basic claims: (1) breach of contract; (2) fraud; (3) conspiracy to injure business in violation of Va.Code Ann. Secs. 18.2-499 et seq.; (4) violation of the New Jersey Franchise Practices Act, N.J.Stat.Ann. Sec. 56:10; (5) civil RICO; and (6) tortious interference with franchise rights.
 
 
 5
 On November 21, 1986, the district court dismissed the claims of the individual plaintiffs--Faltings and Corcoran--for lack of standing. On March 13, 1987, the district court granted summary judgment in favor of IBM on a number of the corporate plaintiffs' claims. By trial, the only claims remaining were Security Software's claims for breach of contract, conspiracy, and tortious interference with franchise rights, and Marlton's claim for conspiracy. At the conclusion of the plaintiffs' evidence, the district court directed a verdict for IBM on the conspiracy claims--removing Marlton from the litigation--and on portions of Security Software's claims for breach of contract and tortious interference with franchise rights. The remaining claims were submitted to the jury, which returned a verdict for IBM on all counts. This appeal followed.
 
 II
 
 6
 On appeal, the plaintiffs raise numerous assignments of error. Only five of these merit discussion, and we take them in order.
 
 
 7
 * We address first the plaintiffs' argument that the district court erred in directing a verdict for IBM on Security Software's claim that IBM's termination of the Agreement was a breach of contract. The district court based this ruling on the following provision in the Agreement:
 
 
 8
 Notwithstanding any other provision of this Agreement, it may be terminated, with or without cause, upon three months' written notice by IBM or upon two months' written notice by the Dealer.
 
 
 9
 The plaintiffs argue that the court's ruling was erroneous for two basic reasons: (1) that the "termination without cause" provision is unenforceable against them under applicable state law; and (2) that even if the termination provision is generally enforceable, it is sufficiently ambiguous in its application to these facts that the breach of contract claim should have been submitted to the jury. We are not persuaded by either argument.
 
 
 10
 The plaintiffs contend first that the termination without cause provision cannot be enforced against them because to do so would violate the public policy expressed in the New Jersey Franchise Practices Act, which prohibits a franchisor from terminating a franchise agreement without "good cause." The district court rejected this argument because it found that the Agreement was governed not by the law of New Jersey but by the law of New York, and the plaintiffs had not shown that the termination without cause provision would be unenforceable under New York law. In so holding, the district court relied upon a choice-of-law provision in the Agreement that specifically provided that "[t]his Agreement is governed by the laws of the State of New York." Although the plaintiffs concede that this choice-of-law provision is generally valid, they argue that New Jersey law should be applied to determine the enforceability of the termination without cause provision, under Sec. 187(2)(b) of the Restatement (Second) of Conflicts, which provides that a contractual choice-of-law provision will not be given effect on matters of substantive validity and enforceability when
 
 
 11
 application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which ... would be the state of the applicable law in the absence of an effective choice of law by the parties.
 
 
 12
 New Jersey has a materially greater interest in the application of its own law and would be the state of applicable law in the absence of an effective choice-of-law specification, they argue, because Security Software is a New Jersey corporation and the Agreement was to be performed primarily within its borders. Application of the specified law here, they contend, would be contrary to New Jersey's public policy of protecting franchises against terminations without cause. Accordingly, they conclude, the validity of the termination clause must be determined by reference to New Jersey law, notwithstanding the contractual choice-of-law clause.
 
 
 13
 We disagree. Because a federal court sitting in diversity must apply the choice-of-law rules of the forum state, see Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496-97 (1941), the district court was bound to follow Virginia's choice-of-law rules in deciding which state's substantive law would govern the enforceability of the termination clause. Virginia's courts have traditionally been reluctant to displace contractual choice-of-law provisions, absent a showing of unconscionability. See, e.g., Tate v. Hain, 25 S.E.2d 321, 324 (Va.1943) (refusing to displace parties' specification of governing law, even though it conflicted with Virginia law.)[1] Virginia has not generally adopted the Restatement (Second)'s flexible approach to choice-of-law analysis, and the plaintiffs have cited no Virginia authority indicating that it might recognize the Sec. 187(2)(b) limitation on the parties' ability to specify the law that will govern their agreement.[2] The only intimations that Virginia might not enforce the parties' choice-of-law provision in a contract concern situations in which there was "no reasonable basis for the parties' choice" or where one of the parties was misled into agreeing to the provision. See Wellmore Coal Corp. v. Gates Learjet Corp., 475 F.Supp. 1140, 1144 & n. 3 (W.D. Va.1979) (citing Tate); see also Tate, 25 S.E.2d at 324 (parties' choice-of-law provision might not be enforced if found to constitute a "fraud on the law"). Under these circumstances, we are unwilling to assume that Virginia would deviate from its traditional policy of giving full effect to contractual choice-of-law provisions. Accordingly, we hold, as did the district court, that the law of New York, rather than New Jersey, governs the enforceability of the termination clause at issue here.[3]
 
 
 14
 Even if New York law applies, the plaintiffs argue, IBM's power to terminate their franchise is limited by an implied covenant of good faith and fair dealing. We disagree. It is true that under New York law every contract contains an implied covenant of good faith and fair dealing. See, e.g., Kirke La Shelle Co. v. Paul Armstrong Co., 188 N.E. 163, 167 (N.Y.1933). But the New York Court of Appeals has traditionally enforced unrestricted termination clauses as written. See, e.g., A.S. Rampell, Inc. v. Hyster Co., 144 N.E.2d 371, 379 (N.Y.1957) (refusing to read implied right to reasonable notice into contract provision giving power to terminate at any time). For this reason, several federal courts have concluded that the good faith requirement applies only to the exercise of obligations which the parties owe to each other during the term of a contract, and New York's implied covenant of good faith and fair dealing does not limit the operation of unrestricted termination clauses. Alco Standard Corp. v. Schmid Bros., Inc., 647 F.Supp. 4 (S.D.N.Y.1986); Niagara Mohawk Power Corp. v. Graver Tank & Mfg. Co., 470 F.Supp. 1308 (N.D.N.Y.1979). The plaintiffs claim that these federal decisions have misinterpreted the law of New York. But they can point to only two New York cases--Integrated Sales v. Maxell Corp., 463 N.Y.S.2d 809 (A.D.1983), and Richard Bruce & Co. v. J. Simpson & Co., 243 N.Y.S.2d 503 (N.Y.Sup.Ct.1963)--holding that an implied covenant of good faith applies to the exercise of unlimited termination clauses. These lower court decisions are not binding on this court, and we think, as did the district court, that the New York Court of Appeals would be unlikely to follow them, given its general willingness to enforce termination clauses as written. We therefore conclude that the district court properly ruled that IBM's power to terminate the Agreement was not limited by an implied covenant that it act in good faith.
 
 
 15
 Nor are we persuaded by the plaintiffs' argument that the Agreement contains an ambiguity about IBM's power to terminate here that should have been submitted to the jury. On its face, the clause at issue plainly gives IBM the right to terminate without cause upon three months' written notice. The plaintiffs claim this provision is rendered "ambiguous," however, by the existence of another clause in the Agreement which gives IBM the right to terminate upon two months' notice only if it gives the dealer a chance to "cure" his deficiencies first. Reading these two termination provisions together, they argue, a jury could have reasonably concluded that the "opportunity to cure" requirement also limits the operation of the clause permitting IBM to terminate on three months' written notice.
 
 
 16
 We disagree. The termination without cause clause at issue here specifically states that it stands alone: "Notwithstanding any other provision of this Agreement, it may be terminated, with or without cause, upon three months' written notice by IBM." Given this clear and unequivocal language, we agree with the district court that this was not an issue of contract interpretation for the jury and that, to the contrary, the contract unambiguously conferred an unrestricted right to terminate upon three months' notice. We conclude that the district court did not err in directing a verdict for IBM on the claim of breach of contract by wrongful termination.
 
 B
 
 17
 The plaintiffs claim next that the district court erred in refusing to rule, as a matter of law, that the Agreement did not forbid it to sell to resellers. The plaintiffs' argument is based entirely on the following sentence in the Agreement: "The Dealer shall market the IBM products to its customers at such prices and under such terms and conditions as it shall determine." The plaintiffs argue that this sentence establishes, as a matter of law, that the contract did not forbid sales to resellers.
 
 
 18
 We disagree. Read in context, the phrase "as it shall determine" plainly refers to "prices, ... terms and conditions," rather than to "customers." Moreover, page one of the Agreement specifically provides that "the Dealer shall have no right to, and agrees it will not, appoint additional authorized dealers, warranty service centers, or distributors of IBM." These two provisions, read together, were more than sufficient to justify submission to the jury of the issue whether the Agreement forbade sales to resellers if they did not in fact compel the conclusion that, as a matter of law, they unambiguously did so forbid.
 
 C
 
 19
 The plaintiffs claim next that the district court erred in directing a verdict for IBM on their claim that IBM had conspired with Entre to drive them out of business. There is no merit to this contention for the record simply does not contain sufficient evidence that any agreement to do a wrongful act ever existed between IBM and Entre. The plaintiffs argue, however, that the paucity of their evidence of conspiracy is due to the district court's wrongful exclusion of the testimony of Edward Ingram. Ingram is a former Entre employee who the plaintiffs claim would have testified that a second Entre employee, Fred Zamer, told him that he had heard from an unidentified source that IBM knew Entre itself had made unauthorized sales into the gray market but agreed to do nothing if Entre would help it close down Security Software. The district court excluded Ingram's testimony as multiple hearsay. On appeal, the plaintiffs argue that his testimony was admissible under the Fed.R.Evid. 801(d)(2)(E) co-conspirator exception, apparently on the theory that both Zamer and his source, as employees of Entre, were "co-conspirators" of IBM. But the district court specifically found that Zamer's statement was not made during the course of the alleged conspiracy, and we have not been shown that this underlying finding of fact, essential to the application of the 801(d)(2)(E) exception, was clearly erroneous.
 
 D
 
 20
 The plaintiffs contend next that the district court erred in dismissing Marlton's claims prior to trial. We disagree. The district court's dismissal of Marlton's breach of contract claim was based on its finding that Marlton itself had never entered into a contract with IBM, and we do not think this dispositive finding of fact was clearly erroneous.[4] As for Marlton's conspiracy claim, it was properly dismissed for the reasons given above.
 
 E
 
 21
 The plaintiffs' final allegations of error are directed at two evidentiary rulings made by the district court. First, they contend that the court erred in refusing to allow them to introduce copies of the Uniform Franchise Offering Circular (UFOC) distributed by Entre to its franchisees in time for two of their witnesses to refer to it. There is no merit to this argument. The district court admitted the UFOC as soon as the proper foundation for it was laid, and had the plaintiffs wished to get in the witnesses' testimony about it, they could have recalled them after the document was admitted. The plaintiffs also contend that the district court wrongfully excluded some exhibits dealing with IBM's treatment of other dealers who it believed to be making unauthorized sales into the gray market. The exhibits were offered to show that IBM had breached the implied covenant of good faith and fair dealing that it claims limited IBM's power to terminate. Since the district court properly ruled that the implied covenant of good faith did not limit IBM's power to terminate, however, any error here, even if made, was necessarily harmless.
 
 III
 
 22
 The plaintiffs' remaining allegations of error are without merit and do not warrant discussion here.
 
 
 23
 AFFIRMED.
 
 
 
 [1]
 As the district court specifically noted, "there is no evidence of any unconscionability in this case."
 
 
 [2]
 In arguing for the application of the Sec. 187(2)(b) public policy limitation, the plaintiffs rely primarily upon Business Incentives Co. v. Sony Corp. of America, 397 F.Supp. 63 (S.D.N.Y.1975). That case is completely inapposite here, for it was decided by a federal diversity court sitting in New York and applying New York's choice-of-law provisions. As indicated earlier, the district court here was bound to follow the choice-of-law rules of Virginia, which are considerably different than those of New York
 
 
 [3]
 Even if Sec. 187(2)(b) were generally applicable in Virginia, we do not think it would dictate a different result in this case. Under New Jersey law, "good cause" is defined as "failure by the franchisee to substantially comply with the requirements imposed on him by the franchisor." Shell Oil Co. v. Marinello, 307 A.2d 598, 602 (N.J.1973). If, as IBM alleges and the jury found, the contract here did indeed forbid Security Software to sell to resellers, then its gray market sales would have justified IBM's termination of its franchise, even under New Jersey law
 
 
 [4]
 Marlton never attempted to assert a contract claim against IBM as a third-party beneficiary of the Agreement between IBM and Security Software