**Francisco Malandrini NETO, as administrator and executor of the Estate of Berthold Falk, deceased, Plaintiff,**

v.

**Gerald THORNER, Defendant.**

**No. 87 Civ. 3447 (RPP).**

United States District Court,
S.D. New York.

Sept. 5, 1989.

Robert Lewis, Baker & McKenzie, New York City, for plaintiff.

Jack H. Dorfman, Fodera, Dorfman & Ferrari, Brooklyn, N.Y., for defendant.

OPINION AND ORDER

ROBERT P. PATTERSON, Jr., District Judge.

This motion for summary judgment presents the following question of New York law: when a foreigner dies testate, does New York law or the law of the

decedent's domicile govern the disposition of the assets of the decedent's Totten trust?[1]

In 1963, Berthold Falk opened a Totten trust for the benefit of Gerald Thorner in the New York branch of what later became the National Westminster Bank.[2] Twenty-two years later, on November 14, 1985, Falk died in Sao Paulo. A will under Falk's name dated January 17, 1985, unsigned, but apparently valid under the laws of Brazil, provided as follows (in the English translation from the Portuguese):

> The Testator wishes and determines that, by the time of his succession, all the deposits or values existing in his name, in the banks located in Brazil or abroad, ... shall be distributed as follows: to Mr. Mauricio Carlos Szczupak Falk ..., 40% (forty percent) ...; to Dr. Francisco Malandrini Neto, 42,5% (forty two and a half percent) ...; to Mr. Arnaldo Vicentini ..., 7,5% (seven and a half percent) ...; and to Ms. Maria Lucimar Duarte Pimenta, ... 10% (ten percent)....

Upon learning of Falk's death, Thorner withdrew the proceeds of the Totten trust from the New York bank. Thereafter, in 1987, Francisco Malandrini Neto, the executor, as well as the major beneficiary, of Falk's estate, brought this diversity action for conversion when he learned of the existence of the account and of Thorner's withdrawal of the funds.[3]

Thorner has now moved for summary judgment.[4] He contends that Falk's will

---

1. *See Matter of Totten,* 179 N.Y. 112, 125–26, 71 N.E. 748, 752 (1904):

   > A deposit by one person of his own money in his own name as trustee for another, standing alone, does not establish an irrevocable trust during the lifetime of the depositor. It is a tentative trust merely, revocable at will, until the depositor dies or completes the gift in his lifetime by some unequivocal act or declaration, such as delivery of the passbook or notice to the beneficiary. In case the depositor dies before the beneficiary without revocation, or some decisive act or declaration of disaffirmance, the presumption arises that an absolute trust was created as to the balance on hand at the death of the depositor.

2. In the affidavit accompanying his motion for summary judgment, Thorner described the backdrop of the events that gave rise to this suit:

   > The scenario begins in the 1930s, in Berlin during the "Hitler period." Berthold Falk's father and Meta Kohlhagen's mother were siblings; they and their families were very close; the children were raised in one another's home. My wife's maiden name was Fritzi Kohlhagen; she is Meta Kohlhagen's daughter. Fritzi, Berthold Falk, and his brother, Eugen Falk, were first cousins and were very close. Because of the Holocaust, the families were separated. Meta Kohlhagen went to the United States. She did not hear from or about the Falk family until after World War II when she received a letter from Berthold Falk. My wife's father, ... without knowing the Falks' financial circumstances, immediately submitted the necessary papers to enable the Falks to migrate to the U.S.A. For this concern and interest, the Falks were very grateful.
   >
   > However, Berthold Falk and his brother, Eugen, had emigrated to Brazil and decided to remain. They went into business and eventually amassed a fortune importing stainless steel.
   >
   > In 1951, Berthold Falk suffered a heart attack. During the recuperative period he came to New York and for three months lived with my wife's parents and Fritzi, who was not married at the time. He became deeply indebted to the Kohlhagens for the care and treatment he received during the three month period—both medical and emotional.
   >
   > At this time I met Berthold Falk as I was courting my wife to be. He liked me and was instrumental in our engagement. In July, 1952 we were married. Berthold Falk was invited to our wedding and traveled from Brazil to New York for the event. For a wedding present, he invited us to Brazil where we spent our honeymoon—he paying all expenses.
   >
   > The family warmth continued and extended to both me and my wife, Fritzi....
   >
   > Briefly, and not to encumber this affidavit with a morass of documents accumulated over the years until the date of his death, Berthold Falk personally made substantial deposits directly into the account in question, during his frequent visits to New York when he stayed with Fritzi and me....

   Affidavit of Gerald Thorner ¶ 4 (Feb. 21, 1989).

3. Malandrini, who was Falk's attorney and helped draft the will, is a resident of Brazil. Thorner is a resident of New Jersey. The assets of the trust total $566,532.44. *See* 28 U.S.C. §§ 1332(a)(2), 1391(a).

4. *See* Affirmation of Jack H. Dorfman, Attorney for defendant Gerald Thorner ¶ 3 (Feb. 23, 1989):

   > Although the attorneys for the respective parties have not formally stipulated as to an agreed statement of facts, there have been

does not meet the strictures of N.Y. Est. Powers & Trusts Law § 7–5.2(2) (McKinney 1989), and that the putative revocation of the Totten trust was therefore ineffective. Section 7–5.2(2), enacted in 1975, provides, in relevant part:

> The funds in a trust account ... shall be trust funds subject to the following terms:
>
> .    .    .    .    .
>
> (2) A trust can be revoked, terminated or modified by the depositor's will *only* by means of, and to the extent of, an express direction concerning such trust account, which must be described in the will as being in trust for a named beneficiary in a named financial institution.... A testamentary revocation, termination or modification under this paragraph can be effected by express words of revocation, termination or modification, or by a specific bequest of the trust account, or any part of it, to someone other than the named beneficiary....

N.Y. Est. Powers & Trusts Law § 7–5.2(2) (McKinney 1989) (emphasis added).

Since the statute's enactment New York courts have consistently held that if a will does not conform precisely to the dictates of Section 7–5.2(2), the terms of a Totten trust remain in force. *See, e.g., Matter of Will of Young*, 137 Misc.2d 744, 522 N.Y. S.2d 795 (1987) (will naming bank but not beneficiary did not revoke Totten trusts); *Estate of Flynn*, 119 Misc.2d 561, 463 N.Y. S.2d 719 (1983); *Estate of Silberkasten*, 102 Misc.2d 227, 423 N.Y.S.2d 141 (1979); *cf. Long Island Sav. Bank v. Savage*, 116 A.D.2d 512, 497 N.Y.S.2d 914 (1986), *aff'd mem.*, 69 N.Y.2d 751, 505 N.E.2d 244, 512 N.Y.S.2d 801 (1987). As the Law Revision Commission wrote in its official statement in support of the proposed law, "[t]his bill is needed to achieve clarity and consistency in the law governing Totten trusts. It will reduce litigation in this area, where such litigation is unfortunate because many persons use this trust device as a substitute

for a testamentary disposition." Memorandum of the Law Revision Commission Relating to Bank Accounts in Trust Form ("Totten Trusts"), 1975 N.Y. Legislative Reports 1534, 1534 (McKinney 1975) [hereinafter *Commission Memorandum*]; *see also id.* at 1534–36; *Estate of Silberkasten, supra;* Annotation, *Revocation of Tentative ("Totten") Trust of Savings Bank Account by Inter Vivos Declaration or Will*, 46 A.L.R.3d 487 (1971); *cf., e.g., Matter of Estate of Bol*, 429 N.W.2d 467 (S.D.1988).

As a federal court sitting in diversity, this Court must apply the law of New York. It is plain that Falk's will does not comply with section 7–5.2(2) of the Estates Powers & Trust Law. If that statutory provision applied, the would-be testamentary revocation of the account in trust for Thorner would have no legal bearing. In opposing this motion, however, Malandrini contends that Falk's will does not have to meet the requirements of the New York statute. According to Malandrini, under the law of Brazil, the will would be valid— and the law of Brazil, he argues, not the law of New York, governs this dispute's resolution. This Court reaches a different conclusion.

The substantive law of New York, of course, includes New York's choice of law principles. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Section 3–5.1 of the New York Estates Powers & Trusts Law codifies the rules concerning the "Formal validity, intrinsic validity, effect, interpretation, revocation or alteration of testamentary dispositions of, and exercise of testamentary powers of appointment over property by wills having relation to another jurisdiction." Section 3–5.1(b)(2) provides:

> The intrinsic validity, effect, revocation or alteration of a testamentary disposition of personal property, and the manner in which such property devolves when not disposed of by will, are deter-

---

statements between the attorneys, and on occasion in Court, to the effect that there is no dispute as to the essential facts upon which this Motion for Summary Judgment is predi-

cated—principally, that the account at issue is a Totten Trust and Gerald Thorner is the named beneficiary.
*See also id.* ¶ 4.

mined by the law of the jurisdiction in which the decedent is domiciled at death. According to Malandrini, that statute embodies the "firmly established rule that the law of the testator's last domicile governs the testamentary disposition and intestate distribution of personal property." N.Y. Est. Powers & Trusts Law § 3–5.1 revisers' notes;[5] *see, e.g., Will of Brown*, 120 Misc.2d 799, 466 N.Y.S.2d 988 (1983); *New York Life Ins. & Trust Co. v. Viele*, 161 N.Y. 11, 19, 55 N.E. 311 (1899); *see also* Restatement (Second) of Conflicts of Laws § 263(1) (1971); *cf. Harrison v. Nixon*, 34 U.S. (9 Pet.) 483, 504, 9 L.Ed. 201 (1835) (Story, J.). Malandrini argues that a Totten trust is personal property, *see* N.Y. Est. Powers & Trusts Law § 3–5.1(a)(2), and that it therefore passes to the Brazilian estate's beneficiaries in accordance with Brazilian law and the terms of Falk's will.

It is this Court's conclusion, however, that in passing section 7–5.2(2) in 1975, the legislature did not intend to bring Totten trusts within the coverage of section 3–5.1. Malandrini's argument thus fails as a matter of law.

The only relevant decisions on the application of the choice of law principles to Totten trusts are *Wyatt v. Fulrath*, 16 N.Y.2d 169, 211 N.E.2d 637, 264 N.Y.S.2d 233 (1965) and *Matter of Senft*, N.Y.L.J., Aug. 17, 1987, at 14, col. 2 (Sur.Ct.2d Dep't 1987). Each confirms that under New York law, the title to a bank account held in a New York bank is governed by the law of New York.

In *Wyatt v. Fulrath*, the ancillary administrator of the estate of the Duke of Arion sued the executor of the will of the Duchess of Arion to determine the title to joint bank accounts held in New York State. According to the Court of Appeals, "[t]he main issue in the case is whether the law of Spain[—the decedents' domiciles—]should be applied to the property placed in New York during the lives of the spouses, ... or the law of New York[—the situs of the accounts]...." 16 N.Y.2d at 172, 211 N.E.2d 637, 264 N.Y.S.2d 233. New York

law would have given the Duchess's estate all of the property; Spanish law would have given her estate half. Because the Duke and Duchess "agreed to a written form of survivorship account conformable to New York law," *id.* at 171, 211 N.E.2d 637, 264 N.Y.S.2d 233, the Court of Appeals gave their intentions effect. Judge Bergan explained the rationale supporting the rule that *Wyatt v. Fulrath* established:

> ... *New York has the right to say as a matter of public policy whether it will apply its own rules to property in New York of foreigners who choose to place it here for custody or investment,* and to honor or not the formal agreements or suggestions of such owners by which New York law would apply to the property they place here.
>
> It seems preferable that as to property which foreign owners are able to get here physically, ... that we should recognize their physical and legal submission of the property to our laws, even though under the laws of their own country a different method of fixing such rights would be pursued.

16 N.Y.2d at 173, 211 N.E.2d 637, 264 N.Y.S.2d 233 (emphasis added); *see also Hutchison v. Ross*, 262 N.Y. 381, 388–89, 187 N.E. 65 (1933) ("When the owner of personal property authorizes its removal from his domicile or acquires property elsewhere, he must be deemed to know that his property comes under the protection of, and subject to, the laws of the jurisdiction to which it has been removed, and that appeal may be made to the courts of that jurisdiction for the determination of conflicting rights of such property.") (Lehman, J.), *quoted in Wyatt v. Fulrath*, 16 N.Y.2d at 174, 211 N.E.2d 637, 264 N.Y.S.2d 233.

In 1963 Berthold Falk chose a New York bank as the situs of his Totten trust. Like the Duke and Duchess of Arion, Falk elected to have his bank trust account governed by the laws of New York. *Cf. Wyatt v. Fulrath*, 16 N.Y.2d at 180, 211 N.E.2d 637, 264 N.Y.S.2d 233 (Desmond, C.J., dissenting); *Estate of Renard*, 108 Misc.2d 31, 437

---

**5.** Section 3–5.1(b)(2), which took effect in 1967, replaced N.Y. Decedent Est. Law § 47, which itself replaced N.Y.Code Civ.P. § 2694, enacted in 1880.

N.Y.S.2d 860, *aff'd mem.,* 85 A.D.2d 501, 447 N.Y.S.2d 573 (1981), *aff'd mem.,* 56 N.Y.2d 973, 439 N.E.2d 341, 453 N.Y.S.2d 625 (1982); *cf. also* N.Y.Est. Powers & Trusts Law § 3–5.1(h); *Sanchez v. de Davila,* 547 So.2d 943 (Fla.Ct.App.1989). New York law should therefore determine the trust's disposition.

*Matter of Senft* involved facts similar to the ones in this case, and the court there addressed the same question of law. In that case, Charles V. Senft had established Totten trusts in a New York bank for the benefit of three of his grandchildren. In a will he later executed in Florida, where he was domiciled, Senft wrote that if any of the beneficiaries had not reached twenty-five at the time of his death, "I cancel and terminate said trusts and I [deposit] the sums held in said Totten Trust accounts" to certain other accounts. Senft subsequently died in Florida. In response to a petition to determine the validity of the proposed revocation with respect to the underage grandchildren, Surrogate Signorelli wrote,

> The construction of a document executed by a nonresident of this state, to wit, the decedent's Florida will, that purports to revoke any type of trust of personal property is governed by the law of the situs of the trust corpus, that is, in the case at bar, where the banking institution was organized and conducts its business. Accordingly, EPTL 7–5.2(2) is the governing law herein.... Our courts have strictly construed this statute and, consequently, only full compliance with the statutory provisions will effectuate a revocation of a totten trust.

*Matter of Senft,* N.Y.L.J., Aug. 17, 1987, at 14, col. 3 (citations omitted).

For seventy years following *Matter of Totten,* the law of New York was well settled that bank accounts held in the name of the depositor in trust for a beneficiary passed by operation of law to the beneficiary upon the depositor's death.[6] They were deemed revocable trusts, for the depositor could withdraw the assets at any time. As revocable trusts the law of the

situs of the corpus of the trust governed the trust's terms. Totten trusts were contracts between the cestui que trust and the depositing institution for the benefit of a third party. They did not make up part of the testamentary estate in probate proceedings but were subject to the claims of creditors. Indeed, as the Law Revision Commission noted, Totten trusts were often used to avoid probate. Other testators used Totten trusts in order to provide for certain persons without the knowledge of the beneficiaries of their testamentary estate. Citizens of foreign countries used Totten trusts to maintain assets for their families in the United States and thereby evade the currency laws in their native lands or to protect against the fallout from revolutions.

When New York amended the Estates Powers and Trusts laws in 1975 to include an article covering Totten trusts, a depositor was permitted to revoke, terminate, or modify such a trust by his or her will only by means of, and to the extent of, an express direction identifying the trust account by beneficiary and financial institution.

In this Court's judgment, the New York legislature did not intend by the new article "Bank Accounts in Trust Form" to permit a revocation of the terms of a Totten trust set up by persons who had chosen to use this unique vehicle to achieve their aim of transferring assets on death by anything less than strict adherence to the statutory requirements. The new article related to bank accounts in trust form only and its general intent was to codify existing law regarding Totten trusts.

The history of this enactment is an interesting one. *See Commission Memorandum, supra.* The legislation originated in the New York State Law Revision Commission. In 1973 the Commission sought to codify the law of New York concerning Totten trusts to eliminate litigation that had arisen over the following issues:

A. the effect of a transfer of the passbook to the beneficiary;

---

**6.** An exception existed when a decedent's only asset was a Totten trust and the will's legacies equalled the trust's approximate value. *Matter of Beagan,* 112 Misc. 292, 183 N.Y.S. 941 (1920).

B. oral statements of the decedent in relation to the trust's terms (there, challenges had not been successful);

C. the testamentary exception, which, if the estate's sole assets were the assets of the Totten trust, attempted to preserve a poor decedent's intent as expressed in his or her will, *see Matter of Beagan,* 112 Misc. 292, 183 N.Y.S. 941 (1920); *cf. Matter of Krycun,* 24 N.Y.2d 710, 249 N.E.2d 753, 301 N.Y.S.2d 970 (1969), *rev'g* 32 A.D.2d 616, 300 N.Y.S.2d 864 (2d Dep't 1968).

In the course of the Law Revision Commission's consideration of the form the proposed legislation should take, Professor Kenneth Joyce stated the theory of Totten trusts as follows:

> Totten trusts have traditionally been considered to pass "outside" the probate estate of the decedent-depositor. To be sure, they have subjected to the claims of estate creditors, but they are not, e.g., part of a decedent's estate for intestacy purposes; they cannot be set aside as invalid testamentary dispositions by the decedent's distributees; and, until very recently, ... they have not been subject to the widow's right of election.
>
> Indeed, the essential thrust of the *Totten* case which validated this device was that the decedent had made a *present transfer of an interest in the deposit to the beneficiary at the time of the establishment of the deposit*—a factor which differentiates it from property in which a decedent maintains complete ownership until his death.
>
> In light of the legal theory supporting Totten trusts, one might justifiably take the position that the case law is in error in allowing such a device to be affected by the decedent's will. At the least, these judicial precedents would seem to represent an anomaly....

Letter from Kenneth F. Joyce to Jay C. O'Brien (Mar. 29, 1973) (emphasis in original). Thereafter the Commission proposed legislation for incorporation of a new article "Bank Accounts in Trust Form" in the Estates Powers and Trust Law. The new article incorporated prior provisions of the banking law; the proposed legislation also sought the repeal of banking law sections which dealt with such accounts.

The essence of the proposed legislation was:

1. A Totten trust could only be revoked, modified or changed by the decedent's withdrawal of funds from the account;

2. The decedent had survivorship rights in the account;

3. Creditors' rights were protected and attorneys' fees were provided for.

This legislation passed both the Senate and the Assembly but was vetoed by Governor Malcolm Wilson because it did not provide for a testamentary exception.

The Law Revision Commission then reconsidered the matter and in late 1974 proposed new legislation to the same effect but adding the present section, section 7–5.-2(2), which permitted the revocation, modification, or termination of a Totten trust only if the will named the depository bank and the beneficiary.[7]

At no point in the Law Revision Commission's records or any bar association report on the legislation was there any indication that the choice of law provisions might apply. Nothing in the legislative history or reports of the Law Revision Commission demonstrates an intention to allow the law of domicile of the depositor to modify these requirements. There is no statutory limitation in section 7–5.2(2) of the Estates Powers & Trust Law to New York decedents. Nor is there an exception in the statute for foreign wills. The only authority subsequent to the statute's enactment is *Matter of Senft, supra.*

In sum, because Falk's will did not comply with the requirements of New York law, the revocation of the Totten trust was invalid, and Malandrini, as executor of Falk's estate, cannot maintain a cause of action against Thorner for the conversion of the proceeds of the trust. Thorner's

---

**7.** The Commission recognized that allowing any testamentary revocation to be effective was contrary to the Uniform Probate Code, Unif.Probate Code § 6–104.

motion for summary judgment is therefore granted, and this lawsuit is dismissed.

IT IS SO ORDERED.