## Richmond

COMPTROLLER OF VIRGINIA, *Ex Rel.* VIRGINIA
MILITARY INSTITUTE V. EDWIN
H. KING, ET AL., ETC.

March 4, 1977.

Record No. 760138.

Present, All the Justices.

*Robert P. Kyle, Assistant Attorney General (Andrew P. Miller,
Attorney General; Walter H. Ryland, Assistant Attorney
General,* on briefs), for plaintiff in error.

*James C. Roberts (William Joe Hoppe; Mays, Valentine, Davenport & Moore, on brief), for defendants in error.*

COCHRAN, J., delivered the opinion of the court.

On January 10, 1974, David P. Ayres, Comptroller of Virginia, on behalf of Virginia Military Institute (V.M.I.) filed in the trial court a motion for judgment against Edwin H. King, Frank B. Poole, Jr., and Thomas C. White, partners doing business under the firm name of Lee, King, Poole & White, for damages to a building allegedly caused by defendants in the performance of certain architectural services. Count I of the motion for judgment alleged negligent and improper design of the building, Count II alleged breach of warranties of the plans and specifications, and Count III alleged negligent and improper supervision and failure of inspection by the architects. The architects filed their grounds of defense, a demurrer, and a plea of the statute of limitations. The trial court overruled the demurrer, which alleged that the motion for judgment failed to state a cause of action and misjoined counts in tort and contract, but reserved judgment on the plea of the statute of limitations.

Trial by the court, sitting without a jury, was had on October 7th and 8th, 1975. At the conclusion of the plaintiff's evidence, the court sustained the defendants' motion to strike the evidence and entered summary judgment for them, holding that the statute of limitations barred the action for negligent design and that V.M.I. had failed to prove the portion of damages attributable to any negligence in supervision. Plaintiff has appealed the judgment order entered on October 8, 1975.

The contract, not under seal, between V.M.I. as owner, and the architects, dated September 20, 1965, provided that the architectural firm, then known as Lee, King, and Poole, was to perform the duties of architect, on terms and conditions specified, for a building which V.M.I., "in the execution of a single project ... an Alumni Building", contemplated for the purposes and to the extent set forth in the "Project Criteria" attached. The contract was expressly made subject to and in accordance with all provisions applicable to architects in the current edition of a manual entitled "Manual for Planning and Execution of Capital Outlays", as prepared by the Governor's Office.

Under the "General Conditions of the Contract for Capital Outlay Projects" included in the Manual, it was provided that "all work" was to be done under the supervision of the architects, who were required to determine the acceptability and fitness of all parts of the work, and who were authorized to stop the work if necessary to ensure the proper execution of the contract.

Under other provisions of the Manual, the architects during the preliminary design phase were to supply preliminary drawings, outline specifications, and general descriptions. During the working drawing phase the architects were to provide detailed drawings to show clearly the nature and extent of the work to be performed, the materials, equipment, and supplies required, and the methods of installation and construction. During the construction phase the architects were to perform the following services required by § 45.01:

> "check construction schedules, keep Owner informed of progress of work, check and approve shop drawings, approve materials and equipment and tests thereof, maintain accounts for the work, including the issuing of change orders at the direction of the Owner, check Contractor's Applications for payment, and issue Certificates for Payment in approved amounts, provide administration and supervision of construction, including inspections at the site as may be required to determine that contract documents are being followed . . . instruct Project Inspector, if employed for the work, determine date of substantial completion, make final inspection of the work, assemble required written guarantees, and issue Certificate of Completion and recommend the final Certificate for Payment."

As part of their basic services the architects were also to "advise the Owner concerning correction of difficulties occurring in the building . . . during the Contractor's one-year guarantee period" (§ 45.04). Two sets of "as built" drawings and specifications showing the project as finally completed were also required of the architects. After an initial schematic phase was completed, 10% of the total compensation to be paid to the architects was allowed, and progress payments for the balance of the services were due monthly proportionate to the value of the services rendered, with 75% payable after completion of the

"Construction Documents Phase" of the contract, 95% payable on or before completion of construction, and the remaining 5% payable upon delivery of completion drawings.

The Manual, in § 62.04, delineated the duty of the architects to "render supervision of project to see that construction is completed in accordance with plans and specifications". The architects were required to make recommendations to the owner as to change orders and, upon such recommendation, the owner could authorize minor changes in the plans and specifications, but major changes required the approval also of the Governor.

The parties stipulated to the following chronology of events pertaining to the project:

| | |
|---|---|
| Drawing and specifications tendered to V.M.I. | on or about January 2, 1968 |
| Conditional approval by the Governor | on or about January 16, 1968 |
| Condition having been met, bids were received | February 23, 1968 |
| Installation of all Indiana limestone completed | during June, 1969 |
| Installation of all other stone work, including the flagstone terrace completed | by or before September 23, 1969 |
| Final inspection by architects | November 14, 1969 |
| Substantial completion and occupancy | as of December 1, 1969 |
| "As built" drawings and specifications submitted to V.M.I. | on or about March 17, 1970 |

| | |
|---|---|
| Return by architects to ascertain whether items noted in November 14, 1969 inspection had been corrected | March 27, 1970 |
| Final payment to architects | on or about June 19, 1970 |
| Architects furnished contractor with directions and a drawing for corrective repairs to the terrace riser wall | September 9, 1971 |
| Architects furnished contractor with directions and a drawing for corrective repairs to the top of the terrace stairs | October 5, 1971 |
| Contractor performed no further work of any kind | after March 23, 1972 |
| Architects furnished contractor with directions and a drawing for corrective repairs to outer terrace wall, north riser wall, porch column, and edges of the slate | May 25, 1972 |
| Last visit to site by architects before this action brought | September 13, 1972 |
| Final payment from V.M.I. to contractor | not made |

V.M.I. introduced evidence as to the nature, cause, and amount of damages, and under familiar principles this evidence and all

reasonable inferences therefrom must be regarded in the light most favorable to the plaintiff.

Evidence of deterioration of the building's stonework was first noticed by V.M.I. in December, 1969. By letter to the architects dated February 24, 1970, V.M.I. reported water "leaching through the flagstone and down along the outside steps", causing disfiguration and the rusting of steel balusters and railings. Some "pondage" of water was also reported. The deterioration of limestone and flagstone masonry on the terraces, stairs, building and perimeter walls, and piers of the building's arcade ensued. The limestone was damaged by exfoliation (flaking), discoloration, and spalling (chipping), caused by moisture seeping into it.

Despite various efforts made by the architects to take corrective action after the building was substantially completed, defendant architect Edwin H. King, called as a witness by V.M.I., admitted that the subject building showed "extensive damage" due to "water in the limestone" and "thermal expansion and contraction", possibly made more serious by the water in the limestone, necessitating repairs by the owner. To establish the amount of damages, V.M.I. introduced evidence that it had contracted for repairs to the building in the amount of $179,494 and for architectural services at 10% of that amount.

V.M.I. offered evidence to show that architectural design deficiencies caused the deterioration. It was demonstrated that the design was such that the limestone was in continual, unprotected contact with accumulated moisture, excessive amounts of which, bearing salts and foreign matter, were drawn by capillary action into the naturally porous stone, causing its disintegration, especially when extreme temperature changes occurred.

The building plans called for two largely uncovered, expansive slate flagstone decks, one above a part of the other. Underlying each flagstone deck with its limestone facings was constructed a concrete slab, on which was spread a cement-and-sand setting bed to support the slate laid as a floor upon it.

There was evidence that mortar joints between flagstones normally developed hairline cracks, and hence were not impervious to water falling on the uncovered decks. There was also evidence that the mere entry of water into the setting

bed would not damage the limestone if its flow were diverted from the stone or if the limestone were encased in a waterproofing material. A proper design would require that water entering the setting bed be provided a method of escape, but if moisture were allowed to reach an unprotected limestone wall and accumulate against it continuously, deterioration and discoloration would result.

Clifton L. Barbieri, architect for the stone repairs, testified that the defendant architects' original plans showed that the lower deck's concrete slab sloped continually downward toward the limestone perimeter wall, and this was admitted by defendant King. There was evidence that the expansive areas of uncovered, monolithic flagstone masonry allowed water to enter the setting bed, where, given the slope of the concrete slab, the moisture accumulated against the inadequately waterproofed limestone wall. Barbieri also testified that an architect's design which directed water entering a setting bed toward a limestone wall and allowed moisture to accumulate there without making provision for either removing it or waterproofing the stone would constitute a departure from the customary standards of the architectural profession.

There was also evidence that the amount of water entering the setting beds was increased by failure to install expansion joints where the flagstone masonry met vertical limestone surfaces, such as walls and piers of the arcade, and that proper expansion joints would have lessened the opening of cracks which occurred with thermal expansion and contraction of the flagstone masonry. There was evidence that expansion joints were shown in the specifications but not in the working drawings provided by the architects and not in the shop drawings provided by the contractor and approved by the architects.

Clyde C. Roth, a building consultant, testified that the construction was accomplished in accordance with his interpretation of the plans and specifications for the project.

The trial court found that, whether the action sounded in tort or contract, the period of limitation in respect to the alleged defective design began to run no later than February 23, 1968, the date of final approval of the working drawings and specifications by V.M.I. and the Governor. It proceeded to hold that this aspect of the case was barred by the applicable statute of limitation,

presumably Va. Code § 8-13 (Repl. Vol. 1957) [1] or § 8-24 (Repl. Vol. 1957).[2]

V.M.I. argues that the applicable statute of limitations is Code § 8-24.2.[3] We do not agree. That statute sets an outside limit within which the applicable statutes of limitation operate. Its purpose is not to extend existing limitation periods, such as the two-year period applicable to personal injury actions, but to establish an arbitrary termination date after which no litigation of the type specified may be initiated. *See O'Connor* v. *Altus*, 67 N.J. 106, 335 A.2d 545 (1975); *Federal Reserve Bank of Richmond* v. *Wright*, 392 F. Supp. 1126 (E.D. Va. 1975). We will assume, without deciding, that the statute was correctly construed in *Federal Reserve Bank of Richmond* to require that actions arising from defective and unsafe condition of improvements to real property be brought within five years after the completion of construction, and is not fatally defective on constitutional grounds. *See Rosenthal* v. *Kurtz*, 62 Wis. 2d 1, 213 N.W.2d 741, *reh. den.*, 216 N.W.2d 252 (1974). V.M.I. is neither granted additional time nor time-barred by the statute.

In *Oleyar* v. *Kerr, Trustee*, 217 Va. 88, 225 S.E.2d 398 (1976), we held that an action for the negligence of an attorney in

---

[1] "§ 8-13. **Limitation of personal actions generally.** — Every action to recover money which is founded upon an award, or on any contract, other than a judgment or recognizance, shall be brought within the following number of years next after the right to bring the same shall have first accrued, that is to say:

If the case be upon any contract by writing under seal, whether made by a public officer, a fiduciary or private person within ten years;

If it be upon an award or contract in writing signed by the party to be charged thereby, or by his agent, but not under seal, within five years; and

If it be upon any other contract express or implied within three years, . . . ."

[2] "§ 8-24. **Of actions not before specified.** — Every action for personal injuries shall be brought within two years next after the right to bring the same shall have accrued. Every personal action, for which no limitation is otherwise prescribed, shall be brought within five years next after the right to bring the same shall have accrued, if it be for a matter of such nature that in case a party dies it can be brought by or against his representative; and, if it be for a matter not of such nature, shall be brought within one year next after the right to bring the same shall have accrued . . . ."

[3] "§ 8-24.2. **Certain actions for damages arising out of defective or unsafe condition of improvements to real property.** — No action to recover damages for any injury to property, real or personal, or for bodily injury or wrongful death, arising out of the defective and unsafe condition of an improvement to real property, nor any action for contribution or indemnity for damages sustained as a result of said injury, shall be brought against any person performing or furnishing the design, planning, surveying, supervision of construction or construction of such improvement to real property more than five years after the performance or furnishing of such services and construction. . . . ."

performing professional services, while sounding in tort, is an action for breach of contract and is thus governed by the statute of limitations applicable to contracts. Since the same principle, as counsel for the architects conceded in oral argument, applies with equal logic in the present case, the five year limitation provided by § 8-13, for contracts in writing, but not under seal, is controlling.

■ The architects insist that the contract was a divisible one, calling for design services completed upon final approval of plans on February 23, 1968, and for supervisory services thereafter required during construction; and that the limitation period for damages arising from defective design began upon final approval of plans and barred recovery, because all damages were attributable to misdesign.

We cannot escape the conclusion that V.M.I. has alleged a cause of action for improper design which accrued when the plans were finally approved. At that time, the architects had a right to demand and received payment for their services for that phase of their undertaking. At that time, if defects had been discovered, V.M.I. could have initiated legal proceedings against the architects. *See Federal Reserve Bank of Richmond* v. *Wright, supra* at 1131, and *McCloskey & Company, Inc.* v. *Wright,* 363 F. Supp. 223, 226 (E.D. Va. 1973), in each of which cases it was held that a cause of action for defective plans arose upon tender of the plans by the architect to the owner.

We have followed the general rule that the applicable period of limitation begins to run from the moment the cause of action arises rather than from the time of discovery of injury or damage, and we have said that difficulty in ascertaining the existence of a cause of action is irrelevant. *Housing Authority* v. *Laburnum Corp.,* 195 Va. 827, 838, 80 S.E.2d 574, 580-81 (1954). Thus, in *Hawks* v. *DeHart,* 206 Va. 810, 146 S.E.2d 187 (1966), we held that the statute of limitations began to run from the time the surgeon left a needle in the patient's neck rather than from the time of its discovery. In *Caudill* v. *Wise Rambler, Inc.,* 210 Va. 11, 168 S.E.2d 257 (1969), we held, not inconsistently with *Laburnum,* that the cause of action for personal injury arose at the time of injury rather than at the time the plaintiff purchased the defective vehicle which caused her injury. We observed that at the time of purchase she had a separate cause of action for property damage resulting from alleged breach of the implied

warranty of fitness of the automobile. *See also Barnes* v. *Sears, Roebuck & Co.,* 406 F.2d 859 (4th Cir. 1969), and *Sides* v. *Richard Machine Works, Inc.,* 406 F.2d 445 (4th Cir. 1969).

In *McCormick* v. *Romans and Gunn,* 214 Va. 144, 198 S.E.2d 651 (1973), where there was an undertaking (sale of land, collection and remission of purchase money) requiring a continuation of services by an attorney to a client, we held, under an exception to the general rule, that the statute of limitations did not begin to run until the termination of the undertaking. But in the present case, when the plans were approved the undertaking to furnish them ceased.

The inequities that may arise from the general rule which may trigger a statute of limitations when the injury or damage is unknown or difficult or even incapable of discovery are apparent. *See Insurance Co. of No. America* v. *General Electric Co.,* 376 F. Supp. 638 (W.D. Va. 1974). Nevertheless, we believe that any change in a rule of law that has been followed in our jurisdiction and relied on by bench and bar for so many years should be made not by us, but by the General Assembly, which thus far has not approved any modification.

We hold, therefore, that the trial court correctly ruled that V.M.I.'s cause of action against the architects for allegedly defective design was barred by the statute of limitations which began to run not later than February 23, 1968. However, this ruling is not dispositive of the case. Contrary to the architects' assertion, there was evidence that the damage to the building was caused by negligent failure of the architects to perform their duties of supervision during construction.

In contracting with V.M.I. the architects undertook to perform in good faith and with reasonable care and competence the services for which they were engaged. *Willner* v. *Woodward,* 201 Va. 104, 107-08, 109 S.E.2d 132, 134 (1959); *Surf Realty Corp.* v. *Standing,* 195 Va. 431, 442-43, 78 S.E.2d 901, 907 (1953); *Kostohryz* v. *McGuire,* 298 Minn. 513, 517, 212 N.W.2d 850, 854 (1973). V.M.I. had a right to expect reasonable care and competence not only in preparing plans but in making certain that the construction was properly completed pursuant to the plans and specifications to provide a structure in the final form and condition contemplated by the parties. The architects were obligated to report any serious problem with the design before

construction was completed if they reasonably should have known of the problem.

In their supervision of construction the architects were limited agents of the owner without authority to make alterations in the plans or to bind the owner except as provided in their contract. *Kirk Reid Company* v. *Fine*, 205 Va. 778, 782, 139 S.E.2d 829, 832 (1965). The architects are not correct, however, in contending that the plans, once approved, were immutable. Under the contract, change orders were anticipated, and the architects were required to make recommendations to the owner as to all change orders. Moreover, the contract required supervisory inspections by the architects, at least twice each month, and more frequently if indicated. Under Sec. 45.02 of the Manual it was provided that the "person responsible for the design of the project should participate in these inspections". It seems clear that these contract provisions contemplated supervision by the architects not only to assure compliance by the contractor with the plans and specifications, but also to detect any defects in the design and recommend to the owner any necessary changes and corrections as construction progressed. It is inconceivable that the supervisory obligation could be satisfied by a rigid adherence to plans in which inspection of the project under construction revealed obvious and egregious errors.

There was evidence that, because of improper design, the slope of the concrete slab under the lower deck of the building cast water against limestone. There was evidence that the limestone exposed continuously to water was not properly waterproofed to prevent the moisture from entering the stone. There was evidence that needed expansion joints called for in the specifications were not shown on the working drawings provided by the architects or on the shop drawings which they approved, that these joints were not installed, and that this omission caused unnecessary accumulations of water to permeate the stone.

The architects were not novices in the use of limestone. They stated in answer to interrogatories that they had had experience with more than 40 projects requiring use of limestone, in many instances in exterior installations exposed to the elements. Indeed, defendant King testified that he would not design a building which allowed water to remain continuously in

limestone because he knew that this would be potentially harmful to the stone.

In *Mann* v. *Clowser*, 190 Va. 887, 902-03, 59 S.E.2d 78, 85 (1950), we said that, although a contractor does not impliedly warrant that he has the skill or knowledge of an architect and ordinarily is not liable for the consequences of changes in the architect's plans made with the owner's consent, if the consequences are so obvious and well known to his trade that he should know of them, it is his duty to make a full and fair disclosure to the owner. There is all the more reason to impose upon an architect the duty of disclosing to the owner the consequences of errors in design or construction that are so obvious and well known to his profession that he should know of them. V.M.I., while not bargaining for infallibility on the part of the architects, could reasonably expect them to disclose defects which they observed or should have observed in the construction, whether such defects arose from errors in design or deviations from the plans and specifications.

It is unnecessary for us to determine whether breach of the agreement to supervise occurred upon completion of the installation of limestone in June, 1969, upon completion of all stonework in September, 1969, or at a later date. An opportunity to take corrective action in any event was available until at least June, 1969, the architects breached their agreement to supervise no earlier than that date, and V.M.I. timely filed its motion for judgment within the period of five years thereafter as required by Code § 8-13.

We conclude that it is reasonable to infer from plaintiff's evidence that all damages to the building were attributable to the failure of the architects to fulfill their contractual obligation to supervise the construction. Hence, the trial court erred in ruling that V.M.I. failed to prove its damages resulting from negligent supervision.

For the reasons assigned, the judgment of the trial court will be reversed and the case remanded for a new trial.

*Reversed and remanded.*