UNPUBLISHED

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

LONE MOUNTAIN PROCESSING,
INCORPORATED,

　　　　*Plaintiff-Appellant,*

v.

BOWSER-MORNER, INCORPORATED;
BOWSER-MORNER ASSOCIATES,
INCORPORATED,

　　　　*Defendants-Appellees.*

No. 02-2392

Appeal from the United States District Court
for the Western District of Virginia, at Big Stone Gap.
Glen M. Williams, Senior District Judge.
(CA-00-93-2)

Argued: December 5, 2003

Decided: April 8, 2004

Before NIEMEYER and TRAXLER, Circuit Judges, and
Richard D. BENNETT, United States District Judge for the
District of Maryland, sitting by designation.

---

Affirmed in part, reversed in part, and remanded by unpublished opinion. District Judge Bennett wrote the opinion, in which Judge Niemeyer joined. Judge Traxler wrote a separate opinion concurring in part and dissenting in part.

---

## COUNSEL

**ARGUED:** Frank Kenneth Friedman, WOODS, ROGERS &
HAZLEGROVE, P.L.C., Roanoke, Virginia, for Appellant. Stephan

Forrest Andrews, WRIGHT, ROBINSON, OSTHIMER & TATUM, Richmond, Virginia, for Appellees. **ON BRIEF:** Francis H. Casola, Daniel C. Summerlin, WOODS, ROGERS & HAZLEGROVE, P.L.C., Roanoke, Virginia, for Appellant. Noelle L. Shaw-Bell, David M. Brink, WRIGHT, ROBINSON, OSTHIMER & TATUM, Richmond, Virginia, for Appellees.

---

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

## OPINION

BENNETT, District Judge:

### I.

### *Procedural History*

On May 26, 2000, Lone Mountain Processing, Inc. ("Lone Mountain"), which operates a coal preparation facility in St. Charles, Virginia, filed a two-count complaint against Bowser-Morner, Inc.; Bowser-Morner Associates, Inc. ("Bowser-Morner"), an engineering design firm in Dayton, Ohio, alleging breach of contract and negligence in connection with a November 1, 1991 contract between the parties. Pursuant to that contract, Bowser-Morner was to design a coal slurry impoundment for Lone Mountain's facility. On October 24, 2000, Lone Mountain filed an amended complaint, adding a third count for contractual indemnification. In its answer to the amended complaint, Bowser-Morner asserted the affirmative defense of the statute of limitations. Subsequently, Bowser-Morner moved to dismiss the amended complaint.

The District Court subsequently converted Bowser-Morner's motion to dismiss into a motion for summary judgment. Lone Mountain then filed its own motion for summary judgment. The District Court limited discovery to the issue of statute of limitations. The

motions, both based upon affidavits, were briefed and argued in August of 2001. In February of 2002, the District Judge dismissed both motions without prejudice, advising that the motions should be re-filed based upon additional discovery that had been taken in the interim. In July of 2002, Lone Mountain filed a motion for partial summary judgment on the issue of statute of limitations and repose.[1] Bowser-Morner also filed a motion for summary judgment.

The District Court, in a September 13, 2002 memorandum opinion, granted Bowser-Morner's motion for summary judgment and denied Lone Mountain's partial motion for summary judgment. The court found that Lone Mountain was time-barred from bringing this action pursuant to a contract statute of limitations, referencing Virginia statutory law applying a five-year limitations period for a written contract.

Pursuant to Rule 59(e) of the Federal Rules of Civil Procedure, Lone Mountain moved to alter or amend its judgment, noting that the District Court had ruled that all claims were controlled by the contract statute of limitations and had not addressed the additional claims of negligence, breach of warranty and contractual indemnification. By memorandum opinion dated November 1, 2002, the District Court denied Lone Mountain's motion to alter or amend its September 13, 2002 decision. The District Court reiterated its position on the negligence and breach of warranty claims as set forth in its earlier order. With respect to the contractual indemnification claim, the District Judge reiterated his holding that there was "no apparent need to address an issue that is, in the minds-eye of this court, constitutionally moot." (JA 2059). This appeal follows.

II.

*Facts*

Lone Mountain operates a coal preparation plant in St. Charles, Virginia where it cleans coal in preparation for shipment. On November 5, 1991, Lone Mountain entered into a contract (the "Contract")

---

[1]The District Court subsequently did not address the statute of repose issue.

with Bowser-Morner, an engineering design firm, for engineering and design services related to a coal slurry impoundment adjacent to the coal preparation plant. Pursuant to the Contract, Bowser-Morner agreed to design the structure in accordance with federal regulations established by the United States Department of Mine Safety and Health Administration ("MSHA"), and state regulations established by the Commonwealth of Virginia's Division of Mined Land Reclamation ("DMLR"). While Bowser-Morner was not responsible for securing the necessary permits, it was required to answer questions by federal and state regulators during a review of the design.

The Contract provided that any lack of conformance to regulatory standards was to be corrected by Bowser-Morner at no cost to Lone Mountain. The record of this case indicates that a representative of Bowser-Morner acknowledged that Bowser-Morner had an obligation to answer questions raised by federal and state regulators. (JA 1127-28).

After a lengthy period of regulatory review during the permitting process and after initial federal and state approval of the design, the Bowser-Morner design of the coal slurry was approved on March 20, 1995. Consequently, on March 24, 1995, Bowser-Morner issued what it termed its final payment order to Lone Mountain. Under the Contract, "upon acceptance and approval of the work," Lone Mountain was to retain (10%) and forward the remainder of payment within fifteen days of approval and acceptance. On April 25, 1995, Lone Mountain paid Bowser-Morner's payment order, not exercising any right of retainage.[2]

The question of the completion of the contract is vigorously contested by the parties. Following the acceptance and approval of the design plan, the parties had interactions in August, October, and November of 1995, the legal effect of which are contested by Lone Mountain and Bowser-Morner. In August of 1995, at Lone Mountain's request, Bowser-Morner provided Lone Mountain with a

---

[2]Lone Mountain did not pay for one line-item listed on the invoice, charges of $2,850 for "[a]nswers to questions generated by the state of Virginia in their 10-29-92 comments," because it deemed the item to be "work not authorized." (JA 371, 375).

hydraulics analysis with respect to alternative locations for the impoundment pipe. In October of 1995, representatives of Bowser-Morner visited the impoundment site. In November of 1995, in response to Lone Mountain's request, Bowser-Morner provided a feasibility study for control of cracking concrete in the area of the pipe.

While the ramifications of the above three events in the latter part of 1995 generate a dispute among the parties, it is undisputed that on June 5, 1996, upon filling the impoundment designed by Bowser-Morner with coal slurry, a pipe collapsed allowing contaminated water to escape and leak. This fracturing and cracking along the western wall of the slurry impoundment resulted in the leaking of contaminated water in violation of the National Pollutant Discharge Elimination System permit issued to Lone Mountain. *See* 33 U.S.C. §§ 1311, 1319.

Subsequently, on August 9, 1996, water flowed through a collapsed wall of the slurry impoundment into an abandoned coal mine. DMLR ordered Lone Mountain to suspend operations until repairs could be made. After performing those repairs, Lone Mountain was allowed to restart its operations on August 16, 1996. One month later, on or about September 20, 1996, Lone Mountain discovered another leak in the slurry impoundment in the western wall. On or about October 9, 1996, Lone Mountain discovered yet another leak in the impoundment.

On or about October 24, 1996, a massive leak resulted in the slurry impoundment allowing approximately three thousand gallons of contaminated water per minute to flow into Gin Creek. This contaminated water flowed approximately eleven miles into the Powell River, causing the pool elevation in the impoundment to drop by three feet and contaminating and destroying an estimated eleven thousand fish.

As a result of the leaks and release of contaminated water into the Powell River, which had been designated by the government as a critical habit area, Lone Mountain pled guilty to a two-count information charging it with negligent discharge of a pollutant in violation of 33 U.S.C. §§ 1311, 1319(c)(1)(A) (negligent discharge of a pollutant). In addition, Lone Mountain was required to pay the National Fish and Wildlife Foundation the sum of $15,000. Pursuant to the plea agree-

ment with the government, Lone Mountain was fined a total of $85,000 and was ordered to pay restitution in the amount $1,510,000.

### III.

We review a grant of summary judgment de novo. *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 123 (4th Cir. 1990). Summary judgment is appropriate when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "And, in evaluating a motion for summary judgment, the court must view the record in the light most favorable to the nonmoving party." *Perini Corp.*, 915 F.2d at 123.

When sitting in diversity, a federal court must apply the choice of law rules of the forum state, in this case Virginia. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). Under Virginia law, the parties' choice of law will be enforced if it is "reasonably related to the purpose of the agreement." *Hooper v. Musolino*, 234 Va. 558, 566, 364 S.E.2d 207, 211 (1988)(citing *Tate v. Hain*, 181 Va. 402, 410, 25 S.E.2d 321, 324 (1943); *C.I.T. Corporation v. Guy*, 170 Va. 16, 22, 195 S.E. 659, 661 (1938)). Section 13 of the instant Contract provides that Virginia law governs disputes between the parties arising from the agreement. (JA 183). Thus, as the present parties agree, Virginia law governs the pending matters.

### IV.

The District Court found that Lone Mountain's breach of contract, warranty and negligence claims were time-barred under the applicable statute of limitations. We agree.

### A.

*Breach of Contract/Warranty Count*

Lone Mountain's complaint brought one count for breach of contract, claiming that Bowser-Morner breached its obligations under the Contract by providing defective design services. (JA 29). As noted by

Lone Mountain, the Contract "contained warranties which are integrally related to Lone Mountain's contract claim." (Appellant's Brief at 51). Indeed, the Contract's "Warranty" provision provided that Bowser-Morner would provide services "free from defects." (JA 162). Thus, the "warranty" cited by Lone Mountain simply is another provision of the Contract, and as such, any breach thereof necessarily arises simultaneously with any other design-defect claim asserted under the Contract. *See, e.g., Federal Reserve Bank v. Wright*, 392 F. Supp. 1126, 1129-31 (E.D. Va. 1975) (applying Virginia's five-year statute of limitations for contract claims to a claim for breach of warranty involving alleged defective designs by architects, and holding that the claim arose on the date upon which the architects delivered the defective designs); *McCloskey & Co. v. Wright*, 363 F. Supp. 223, 225-26 (E.D. Va. 1973) (same).

Under section 8.01-246(2) of the Virginia Code, the statute of limitations period applicable to claims on a written contract is five years. The statute of limitations for a design-defect claim based upon a contract commences at the time the defect or condition causing the breach occurs, and not when it is discovered, regardless of the difficulty in ascertaining the existence of the claim. *Virginia Military Institute v. King*, 217 Va. 751, 759, 232 S.E.2d 895, 900 (1977) (hereinafter VMI)(citing *Housing Authority v. Laburnum Corp.*, 195 Va. 827, 838, 80 S.E.2d 574, 580-81 (1954)); *see also* Va. Code Ann. § 8.01-230 ("the right of action shall be deemed to accrue and the prescribed limitation period shall begin to run from . . . when the breach of contract occurs in actions *ex contractu* and not when the resulting damage is discovered . . . .").

The Supreme Court of Virginia established the framework for analyzing design-defect claims in *VMI* and in *Nelson v. Commonwealth of Virginia*, 235 Va. 228, 368 S.E.2d 239 (1988). In *VMI*, the plaintiff sued defendant-architects for alleged professional negligence and improper design work performed pursuant to a divisible contract. *VMI*, 232 S.E.2d at 896. The *VMI* Court held that the plaintiff's cause of action for design-defects accrued when the allegedly defective plans were finally approved. *Id*. at 900. "At that time, the architects had a right to demand and received payment" for their design services, and likewise, at that time, "if defects had been discovered, [the plaintiff] could have initiated legal proceedings against the archi-

tects." *Id.* In so ruling, the court distinguished a situation in which the "continuation of services" exception had been applied to an attorney-client relationship, by emphasizing that in the present case, "when the plans were approved the undertaking to furnish them ceased." *Id.*

Similar to the scenario in *VMI*, in *Nelson*, the plaintiff brought, *inter alia*, design-defect claims against architects stemming from professional services rendered pursuant to a divisible contract. *Nelson*, 368 S.E.2d at 241. The *Nelson* Court found that once the design plans were accepted by the plaintiff, the architects' duty to design the project ended, thereby triggering the limitations period for design-defect claims. *Id.* at 243. The court further noted that although a general architect-owner relationship continued to exist thereafter, the architects' design services effectively ended upon acceptance of the design plans. *Id.*

The instant contractual design-defect claims accrued upon payment by Lone Mountain, because such payment constituted "approval and acceptance" of the designs. Under Section 4 of the Contract, "[u]pon approval and acceptance of the work, [Lone Mountain] shall retain ten percent (10%) and forward payment of the balance within fifteen (15) days thereof." (JA 171). Thus, under the language of the Contract, payment indicated approval and acceptance of the design plans. Bowser-Morner issued its final payment order on March 24, 1995. In reply, Lone Mountain tendered payment to Bowser-Morner on April 25, 1995, thereby indicating approval and acceptance of the work. Accordingly, under applicable Virginia law, the District Judge correctly concluded that Lone Mountain's contractual design-related claims arose on April 25, 1995. *See VMI*, 232 S.E.2d at 900; *Nelson*, 368 S.E.2d at 243.

Relying on *County School Board of Fairfax County v. A.A. Beiro Construction Co.*, 223 Va. 161, 286 S.E.2d 232 (1982) and *Suffolk City School Board v. Conrad Brothers, Inc.*, 255 Va. 171, 495 S.E.2d 470 (1998), Lone Mountain urges the adoption of a "bright line" dichotomy for the accrual of design-defect claims depending on whether the design work is performed pursuant to a divisible or indivisible contract. We decline to establish such a rigid distinction.

In *Beiro*, the parties entered into an indivisible contract for the construction of, *inter alia*, a school building roof. *Beiro*, 286 S.E.2d at

233. Defendant Beiro was a contractor who had retained the right to correct any construction defects until the completion of the building construction. *Id.* The court in *Beiro* found that the plaintiff's claim for defective construction accrued, "at the earliest," upon issuance of the certificate of final payment in August 1973, and not upon the completion of construction in August 1972. *Id.*

Similar to the situation in *Beiro*, in *Conrad Bros.*, the defendant-contractor installed allegedly defective roofs in school buildings pursuant to an indivisible contract. *Conrad Bros.*, 495 S.E.2d at 470. Looking to the express terms of the construction contract at issue, the court found that construction was completed upon the issuance of a "final Certificate for Payment" regardless of the date construction was completed or when the roofs were known to be defective. *Id.* at 471-72. Thus, the submission of the "final Certificate for Payment" triggered the applicable statute of limitations.

Both *Beiro* and *Conrad Bros.* looked to the acceptance of the contracted work through the issuance of final certificates of payment as triggers for the applicable statute of limitations for the construction defect claims in question. Such holdings are consistent with the rulings of *VMI* and *Nelson*, which involved divisible contracts and held that design-defect claims arose at the time the corresponding design plans were accepted.

The instant Contract was not divisible into distinct design, construction or supervision phases because it provided for only one "phase"—the design of the coal slurry impoundment structure. Thus, the Contract simply provided for the execution and delivery of the design plan. Once the completed design plan for the impoundment structure was "approved and accepted" by Lone Mountain, the undertaking to furnish it ceased to exist, thus triggering the accrual of design-defect related claims. *VMI*, 232 S.E.2d at 900; *see also Federal Reserve Bank v. Wright*, 392 F. Supp. 1126 at 1131 (holding that design-defect claims accrued at "the date upon which the architects delivered the defective plans" regardless of when the alleged defect was ascertainable); *McCloskey & Co. v. Wright*, 363 F. Supp. 223 at 226 (holding that a design-defect breach of warranty or contract claim arose "at the time the architects tendered allegedly defective plans to

the government" regardless of when the alleged defect was ascertainable).

Nonetheless, Lone Mountain also asserts that the parties' Contract consisted of an undertaking requiring a "continuation of services," whereby full performance did not occur upon acceptance of the design plan but rather occurred once any post-acceptance services were completed.[3] According to Lone Mountain, such reasoning is in accord with the application of the "continuing services" doctrine in Virginia professional negligence cases involving physicians, attorneys, and accountants. *See, e.g., Farley v. Goode*, 219 Va. 969, 252 S.E.2d 594 (1979) (physician); *McCormick v. Romans*, 214 Va. 144, 198 S.E.2d 651 (1973)(attorney); *Boone v. C. Arthur Weaver Co.*, 235 Va. 157, 365 S.E.2d 764 (1988) (accountant).

Lone Mountain's assertion is unpersuasive, however. Unlike the patient or client relationships created in the medical, legal, and accounting professions, architectural design professionals do not routinely create confidential or fiduciary client relationships entailing inherent, ongoing duties of care. Moreover, the submission of remedial measures or advice does not alter the fact that design-defect claims generally arise at the date when the design initially is accepted by a purchaser, especially when acceptance is pursuant to the terms of a written contract. *See VMI*, 232 S.E.2d at 897, 900 (finding that design-defect claims accrued upon acceptance of design plans despite defendant-architects subsequent corrective design drawings, advice, and site visits). Indeed, to hold otherwise would contravene the purpose of the statute of limitations, in that any remedial work or advice subsequent to design acceptance automatically would re-start the limitations clock in design-defect cases. *See Lavery v. Automation Management Consultants, Inc.*, 234 Va. 145, 148, 360 S.E.2d 336, 338 (1987) (stating that under Virginia law, "a statute of limitations is designed to compel the exercise of a right to sue within a reasonable time; to suppress fraudulent and stale claims; to prevent surprise; to

---

[3]Three interactions following design acceptance specifically are referenced by Lone Mountain as evincing "continuing services": (1) the hydraulics analysis in August, 1995; (2) the site visit by Bowser-Morner representatives in October, 1995; and (3) the feasibility study in November, 1995.

guard against lost evidence; to keep facts from becoming obscure; and to prevent witnesses from disappearing"). Ultimately, therefore, Lone Mountain cannot overcome the fact that under the Contract, payment constituted "approval and acceptance" of the design plans, which in turn triggered the limitations period for related design-defect claims.

B.

*Negligence Count*

Under Virginia law, the contract statute of limitations applies to an action to recover for professional negligence, regardless of whether a claim is framed as a tort. *See, e.g., Boone,* 365 S.E.2d at 766 (holding that the contract statute of limitations applied to an action to recover for the professional negligence of an accountant, despite the fact that the claim was framed as a tort); *VMI*, 232 S.E.2d at 899-900 (holding that the contract statute of limitations applied to an action to recover for the professional negligence of an architect, despite the fact that the claim was framed in tort); *Oleyar v. Kerr*, 217 Va. 88, 90, 225 S.E.2d 398, 400 (1976)(holding that the contract statute of limitations applied to an action to recover for the professional negligence of an attorney, despite the fact that the claim was framed in tort). Such a "result follows from the distinction between duties assumed pursuant to an agreement and duties imposed by general law." *Boone,* 365 S.E.2d at 766. Thus, "[b]ecause there would be no duty from [the professional] to the client in the absence of a contract, the contract statute of limitations applie[s] to the client's action for negligence." *Id.* (citing *Oleyar*, 225 S.E.2d at 399; *VMI*, 232 S.E.2d at 899-900). Therefore, as Lone Mountain's negligence claim stems from its contract with Bowser-Morner for professional design services, the applicable period of limitations for the negligence claim also is five years from the date the design plans were accepted. *See, e.g., Nelson*, 368 S.E.2d at 248.

C.

Lone Mountain's design-defect claims stemming from the Contract accrued on the date the corresponding design plans were accepted, April 25, 1995. Because Lone Mountain filed its complaint on May 26, 2000, the District Court correctly concluded that its breach of contract, warranty, and negligence claims were time-barred under Virgin-

ia's five-year limitations period. Accordingly, we affirm the grant of summary judgment to Bowser-Morner on Lone Mountain's breach of contract, warranty, and negligence claims.

V.

The District Court also found that Lone Mountain's contractual indemnification claim was time-barred under the Virginia statute of limitations for contract claims. Under the "Indemnity" provision of the Contract, Bowser-Morner agreed to "indemnify, hold harmless and defend [Lone Mountain] from any and all liability, claims, demands, suits, expenses and judgments arising out of" the Purchase Order or Bowser-Morner's contractual work. (JA 162, ¶ 8). We disagree with the District Court's conclusion that the indemnity claim filed by Lone Mountain under the above provision was time-barred.

As previously noted, section 8.01-246(2) of the Virginia Code provides a five-year statute of limitations for claims on a written contract. Virginia Code section 8.01-230 establishes the accrual date of actions for which a limitation period is prescribed. In pertinent part, section 8.01-230 provides:

> In every action for which a limitation period is prescribed, the right of action shall be deemed to accrue and the prescribed limitation period shall begin to run from . . . when the breach of contract occurs in actions ex contractu and not when the resulting damage is discovered, except . . . where otherwise provided under . . . § 8.01-249 . . . . Va. Code Ann. § 8.01-230.

Thus, Virginia Code section 8.01-230 explicitly excludes claims under section 8.01-249 from the general statute of limitations accrual date for contracts.

Under section 8.01-249(5) of the Virginia Code, a cause of action for "contribution or for indemnification" accrues "when the contributee or the indemnitee has paid or discharged the obligation." Accordingly, by the plain terms of the statutory language, a claim for indemnification does not accrue until the indemnitee has suffered a

loss. *See Indus. Dev. Auth. v. Bd. of Supervisors*, 263 Va. 349, 353, 559 S.E.2d 621, 623 (2002)(citing *Vaughn, Inc. v. Beck*, 262 Va. 673, 677, 554 S.E.2d 88, 90 (2001)) ("When the language of a statute is clear and unambiguous, [appellate courts] are bound by the plain meaning of that language.").

The rule espoused in section 8.01-249(5) reflects the view that the "accrual of a cause of action for indemnity . . . is better linked to a time at which the indemnitee is injured, not the time at which the original plaintiff was injured." *In re Fela Asbestos Litig.*, 638 F. Supp. 107, 113 (W.D. Va. 1986), *rev'd on other grounds sub nom.*, *Wingo v. Celotex Corp.*, 834 F.2d 375 (4th Cir. 1987); *see also* 41 Am Jur 2d, Indemnity § 43 (2003)("A cause of action on a contract indemnifying against loss or damage does not arise until the indemnitee has actually incurred loss."). This Court adopted identical reasoning in *Walker Manufacturing Co. v. Dickerson, Inc.*, 619 F.2d 305 (4th Cir. 1980), when we held that a claim for indemnity based on a breach of implied warranty was not barred even though the direct action of the original plaintiff was time-barred. *Id.* at 308-10; *see also Premier Corp. v. Economic Research Analysts, Inc.*, 578 F.2d 551, 553-54 (4th Cir. 1978). Other courts routinely apply similar reasoning regarding the accrual of indemnity claims. *See, e.g., Burlington N. R.R. v. Hyundai Merchant Marine Co.,* 63 F.3d 1227, 1230 (3rd Cir. 1995) (stating the general rule that an indemnity claim does not accrue until the indemnitee suffers a loss); *Central Wash. Refrigeration, Inc. v. Barbee*, 133 Wn.2d 509, 517, 946 P.2d 760, 764 (1997) (stating that "[i]ndemnity actions are distinct, separate causes of action from the underlying wrong and are governed by separate statutes of limitations" and citing supporting cases from various jurisdictions in a footnote).

Faced with the patent impact of the controlling statutory language regarding the accrual of indemnification claims and the fact that damage resulting from the design plan first occurred after the impoundment failure in June of 1996, Bowser-Morner contends that Lone Mountain suffered a "loss" triggering an indemnity claim simply by incurring the initial contractual expense of paying for the design plan in 1995. Bowser-Morner's reasoning, however, flies in the face of traditional notions of indemnity reimbursement and loss. Both this Court and the Supreme Court of Virginia have characterized indemnity as

a promise to reimburse for a loss sustained. *See Uptagrafft v. United States*, 315 F.2d 200, 203 (4th Cir.), *cert. denied*, 375 U.S. 818 (1963) (stating that indemnity is a right "generally based upon contract," which "means compensation for loss already sustained"); *First Virginia Bank-Colonial v. Baker*, 225 Va. 72, 77, 301 S.E.2d 8, 11 (1983) (stating that "a contract of indemnity is a bilateral agreement between an indemnitor and an indemnitee in which the indemnitor promises to reimburse his indemnitee for loss suffered or to save him harmless from liability"). Logically, the act of originally paying to obtain an underlying contractual service does not constitute a loss arising out of the contractual work performed for which an indemnitee can be reimbursed. Indeed, under Bowser-Morner's reasoning, Lone Mountain would have been entitled to a full refund of the contractual costs as an indemnitee even if it did not suffer any harm or loss from Bowser-Morner's contractual performance. Quite simply, such a theory is untenable.

Plainly, therefore, Lone Mountain did not suffer damages sufficient to trigger the provisions of Virginia Code section 8.01-249(5) prior to the impoundment failure in June of 1996. At that time, Lone Mountain suffered a loss "arising out of" Bowser-Morner's design work performed under the Contract. Thus, at the time of the impoundment failures, Lone Mountain suffered a loss as a contractual indemnitee, thereby commencing the five-year statute of limitations period for contract claims. Accordingly, by filing a contractual indemnification claim in its amended complaint on October 24, 2000, Lone Mountain brought its action within five years of any indemnitee loss and, therefore, its indemnification claim was timely.

## VI.

For the reasons set forth above, we affirm the District Court's decision that Lone Mountain's breach of contract, warranty and negligence claims were time-barred under Virginia's five-year statute of limitations, but reverse the District Court's determination that Lone Mountain's contractual indemnification claim was time-barred. Accordingly, we remand the contractual indemnification claim to the District Court to permit said claim to proceed on the merits.

*AFFIRMED IN PART, REVERSED IN PART, AND REMANDED*

TRAXLER, Circuit Judge, concurring and dissenting:

I concur in the majority's determination that Lone Mountain's indemnification claim accrued no earlier than June 1996 and that its indemnification claim, therefore, is not barred by the applicable statute of limitations. I also believe, however, that Lone Mountain's breach of contract and professional negligence claims were timely filed. Accordingly, I respectfully dissent from the majority's affirmance of the dismissal of those claims.

As to the breach of contract claim, the majority concludes Lone Mountain accepted and approved the plans for the coal slurry impoundment in April 1995 when it made the final payment to Bowser-Morner and that, under Virginia law, all of Lone Mountain's design-defect claims accrued at that time. I agree that a design-defect claim accrues under Virginia law when the plans are approved. *See Comptroller ex rel. Virginia Military Inst. v. King*, 232 S.E.2d 895, 900 (Va. 1977) ("We cannot escape the conclusion that V.M.I. has alleged a cause of action for improper design *which accrued when the plans were finally approved*." (emphasis added)); *see also Nelson v. Commonwealth*, 368 S.E.2d 239, 247 (Va. 1988). In this case, however, I do not believe that approval occurred upon payment by Lone Mountain.

The contract between Lone Mountain and Bowser-Morner conditions Lone Mountain's obligation to pay upon its "approval and acceptance of the work." J.A. 171. If this were the only relevant contractual provision, then I might agree that, under *VMI* and *Nelson*, Lone Mountain's design claims accrued upon payment. The payment clause, however, must be considered along with the clauses defining Bowser-Morner's obligations under the contract. *See, e.g.*, *Berry v. Klinger*, 300 S.E.2d 792, 796 (Va. 1983) ("The court must give effect to all of the language of a contract if its parts can be read together without conflict. Where possible, meaning must be given to every clause. The contract must be read as a single document. Its meaning is to be gathered from all its associated parts assembled as the unitary expression of the agreement of the parties."). Bowser-Morner was obligated under the contract to design the slurry impoundment "in accordance with all MSHA requirements and memoranda *as well as with the Commonwealth of Virginia criteria*," J.A. 161 (emphasis

added), and to answer questions that arose during the federal and state permitting processes. Thus, the contract required Bowser-Morner to do more than simply deliver plans that satisfied Lone Mountain's particular business needs—the plans also had to comply with significant state and federal regulatory requirements.

In my view, the presence of these complex regulatory permitting schemes and Bowser-Morner's contractual obligation to deliver plans that conformed with all regulatory requirements distinguishes this case from *King* and *Nelson*. In *King* and *Nelson*, the defendant's contractual obligation was to deliver plans that suited the client's particular business needs, and the client was fully capable of determining the suitability of the plans. Thus, the client's approval of the plans signified that the contractual obligation to provide plans had been fulfilled. In this case, however, while Lone Mountain was capable of reviewing the plans to determine whether they satisfied its specific business needs, it did not have the expertise to know whether Bowser-Morner's plans complied with the complex regulatory requirements. That determination could be made only upon approval of the plans by the appropriate state and federal agencies. Thus, while Lone Mountain's payment may have indicated that the plans met its specific business needs, the payment and approval by Lone Mountain cannot be viewed as an indication that the plans conformed with state regulations, as required by the contract.

Accordingly, I would hold that Lone Mountain's design-defect claims did not accrue until November 17, 1995, when the plans were approved by Virginia's Division of Mined Land Reclamation and Bowser-Morner's final obligation under the contract was fulfilled.* Lone Mountain's complaint, filed in May 2000, was thus timely under the applicable five-year statute of limitations. From this conclusion it follows that Lone Mountain's professional negligence claims were also timely filed. *See, e.g.*, *Oleyar v. Kerr*, 225 S.E.2d 398, 400 (Va. 1976) (explaining that a professional malpractice claim, "while sounding in tort, is an action for breach of contract and thus governed

---

*This analysis makes it unnecessary for me to consider the significance of the actions with regard to the impoundment that Bowser-Morner took after the April 1995 payment or whether Lone Mountain's claim could be considered timely under the "continuing services" doctrine.

by the statute of limitations applicable to contracts"). I therefore dissent from the conclusion that Lone Mountain's breach of contract and professional negligence claims were not timely filed.